**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael J. RANDY, Defendant–Appellant.**

**No. 95–2211.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 16, 1996.

Decided April 8, 1996.

Barry Rand Elden, Chief of Appeals, David Glockner (argued), Office of U.S. Atty., Crim. Appellate Div., Chicago, IL, for plaintiff-appellee.

Joseph R. Lopez (argued), Chicago, IL, for defendant-appellant.

Before EASTERBROOK, RIPPLE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Michael Randy appeals from his sentence for mail fraud and RICO violations. He was sentenced to 189 months in prison, 5 years supervised release, a fine of $5,000; restitution of $500,000 was ordered in the event additional funds might be uncovered. In addition, the judge ordered a forfeiture of $1,628,171.74 in assets. As if that were not bad enough, prior to the verdict Randy was a debtor in an involuntary bankruptcy proceeding. He claims to have lost all his assets in that forum.

In November 1988, Mr. Randy, a former Chicago police officer, purchased a "bank" licensed by the government of Montserrat, a tiny island in the British West Indies. The price was $29,500 and he called it the Canadian Trade Bank. It was sold by WFI Corporation, a company apparently in the business of selling "paper" banks which have no employees and no assets beyond the name and the

banking license. When he purchased the bank, Randy said he had assets in excess of $300,000 and had never been bankrupt. In fact, he was at that time in his third personal bankruptcy, and his assets, of course, were modest.

In an effort to eliminate this type of "bank," Montserrat sent notices of revocation to a number of banks. It informed the local agent for the Canadian Trade Bank that its license would be revoked for failure to maintain a $300,000 minimum capital requirement. When the bank did not respond, Montserrat revoked the license. Shortly thereafter, Randy sent WFI an additional $10,000 for the purchase of an entity in Grenada that he named, once again, the Canadian Trade Bank. Grenada had no law authorizing the licensing of offshore banks, so the Canadian Trade Bank became a corporation which simply acted like a bank.

Then, however, Grenada began to tighten up its banking laws. In 1991 it required all companies acting like banks to become licensed. Canadian Trade Bank did not apply for a license and so it was struck from the rolls of registered corporations in December 1991. Needless to say, the bank never had an Illinois license.

From November 1990 through April 1992, Randy advertised in *Broker World,* a nationally circulated insurance industry trade publication. He offered brokers an opportunity to earn "big commissions" through the sale of high yield "domestic (FDIC-insured) CD's and international bank CD's." Interested persons were to respond to an address which turned out to be a "Send it Anywhere" mail box rental facility. Through the ads, Randy developed a nationwide network of brokers who sold $16 million worth of Canadian Trade Bank certificates to more than 400 investors, many of whom were elderly.

Randy opened offices, first in Elk Grove Village and then in Oak Brook Terrace, Illinois. The offices were staffed by three assistants—Berry Maxwell, Cal Herring, and John Czech—and at least one clerical assistant.

In various ways, Randy made many, many misrepresentations to investors and brokers.

He said, for instance, that the funds were insured 100 percent by companies such as Lloyds (which demanded that he stop saying this), and "Polaris," which apparently did not exist. His sales material falsely represented that the Canadian Trade Bank purchased only major national government bonds and invested only in "better" corporations.

He said, among other things, that Grenada conducted several audits each year to ensure the bank's safety and that the bank was regulated by every country it operated in. He told potential investors they could not verify the existence of the bank because it was private. He did not always keep his stories straight. Sometimes he said the bank was located in Grenada; other times that it was in various cities in Canada. He also said that the bank could pay high interest rates and commissions because it had low overhead. Having had about enough of all these misrepresentations, Canadian banking authorities issued a warning that despite its name, the Canadian Trade Bank was not licensed in Canada.

Randy spent most of the money people "invested" in his bank on himself. Approximately $1,277,000 was paid to investors as "interest" and brokers received $1,368,000 in commissions. He used $8,266,000 to make highly speculative investments. Among these were oil paintings, which he titled in his name and that of his wife and—to avoid sales tax—in the God Is Real Universal Life Church.

In September 1992, federal agents searched Randy's home and office. His bank accounts were seized. Undeterred, he continued the operation of the bank, depositing investor checks to the tune of $1,900,000 into an account in a Bridgeport, Connecticut, bank and a Virginia bank. The former account was controlled by David Horowitz and the latter by Lee Coulson.

Randy was arrested in December 1992. At trial he testified that his goal was to help people get better returns on their money. He also said he was the victim of a conspiracy involving the CIA, the FBI, and the IRS. The jury didn't buy his tale and so it convicted him on all 13 counts presented in a superseding indictment.

Mr. Randy does not challenge his conviction. Instead, he raises a number of sentencing issues. First, he attacks the enhancement to his sentence under United States Sentencing Guideline § 3B1.1(a). That section jacks a defendant up four levels for an "aggravating role" in the offense if he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive...." A participant is defined as a person who is "criminally responsible for the commission of the offense." Mr. Randy says that he should not receive the enhancement because his criminal activity did not involve five or more participants; the government says that the activity was "otherwise extensive." We review the interpretation of the guidelines, i.e., what does "otherwise extensive" mean, de novo. *United States v. Messino*, 55 F.3d 1241 (7th Cir.1995). We review for clear error a district court's determination that a factual basis exists for a role in the offense enhancement. *United States v. Michalek*, 54 F.3d 325 (7th Cir.1995).

The phrase "otherwise extensive" is less certain of definition than is the phrase "five participants." But there is guidance as to what "otherwise extensive" means. It is a basis for an enhancement in a limited number of cases where there may not be five criminally liable participants in the illegal activity. Application note 3 to § 3B1.1 of the guidelines states:

In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.

We have recently grappled with the imposition of an enhancement for otherwise extensive activity. In *United States v. Briscoe*, 65 F.3d 576 (7th Cir.1995), there were three direct participants in the criminal scheme, Briscoe himself and two others. However, there were more than five individuals involved in the scheme, either knowingly or unknowingly. There were factors in addition to a "headcount" to justify the finding of otherwise extensive criminal activity. For instance, there were repeated transactions—at least 59 of them. We upheld the enhancement. See also *United States v. Miller*, 962 F.2d 739 (7th Cir.1992) (upholding a finding that criminal activity involving six individuals [2 participants and 4 outsiders] was extensive). Cf. *United States v. Tai*, 41 F.3d 1170 (7th Cir.1994) (holding that if headcount alone is the basis of the enhancement, three participants and two outsiders are not enough; however, a court would be free to consider other factors—if and when they exist.)

Mr. Randy was the founder, promoter, and chief executive officer of the scheme involved in this case. He was its guiding force. To carry out his scheme, he enlisted the perhaps unwitting help of a nationwide network of more than 60 brokers who sold $16 million worth of certificates. He bilked over 400 investors. Furthermore, in the scheme there were at least two other criminally responsible participants: Coulson and Maxwell.

Mr. Coulson received about $107,500 of Canadian Trade Bank proceeds from Randy in exchange for an interest in the Virginia Advertiser, a newspaper which Coulson operated. He was also the sole signatory on an account in Virginia into which $790,000 in checks from Canadian Trade Bank investors was deposited during 1992, after the government seized Randy's Chicago area bank accounts. Mr. Coulson said that he opened the account because Randy told him of the seizure and said he needed help to avoid further seizures. It is reasonable to conclude that he was a "participant," as that term is defined in the guidelines.

Mr. Maxwell was an aide who recruited and managed brokers for Randy. One person testified that he met with Maxwell and John Szech in June 1991 about becoming a broker. During a second meeting, the potential broker asked for the address of the Canadian Trade Bank. He was first told it was in an old building in Montreal; in yet another meeting he was told it was actually in Vancouver. When pressed, both Maxwell and an assistant in Randy's office disappeared from the meeting and never returned. Another broker also testified regarding meetings with Maxwell. After the gen-

darmes searched Randy's offices, Maxwell told that broker to lay off selling for a while, but after two weeks he told him he could resume again. It was not clear error to conclude that Maxwell was also a participant in the scheme.

Randy's scam involved at least three identified participants. There is also a strong hint of several others. But others need not be found because the scope of the enterprise was huge, and that made it "otherwise extensive." The purpose of the aggravating role enhancement under § 3B1.1 is to punish the driving force of a significant criminal enterprise. And that was Randy. In fact, one might say that Mr. Randy was the kind of person the Sentencing Commission probably had in mind when it formulated the enhancement: One can almost look at the guideline section and see his picture.

Another enhancement Randy contests is the four-level enhancement for an offense which affected a financial institution, pursuant to U.S.S.G. § 2F1.1(b)(6). That section provides for an enhancement if the offense

(A) substantially jeopardized the safety and soundness of a financial institution; or

(B) affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense.

Randy argues that the Canadian Trade Bank was not the sort of financial institution the Sentencing Commission intended the guideline to cover. Additionally, he argues that in order for the enhancement to apply, he must have jeopardized a financial institution; in other words, he contends that both subsections (A) and (B) must be satisfied in order for the enhancement to apply.

■ First, we note that application note 14 is sufficiently broad to include the Canadian Trade Bank within its scope. It provides, in part, that:

"Financial institution," as used in this guideline, is defined to include any institution described in 18 U.S.C. §§ 20, 656, 657, 1005–1007, and 1014; any state or foreign bank, trust company, credit union, insurance company, investment company, mutu-

al fund, savings (building and loan) association. . . . .

The Canadian Trade Bank was licensed as a bank by Montserrat and licensed by Grenada as a company with broad banking powers. There is no reason to exclude it from the definition in the application note. Furthermore, when it walks and talks like a financial institution, even if it's a phony one, it is, in our view, covered by § 2F1.1(b)(6).

■ The argument that both subsections (A) and (B) must be met for the enhancement to apply is without merit. We have previously recognized that in the 1991 amendments, the Sentencing Commission added subsection (B) with its less stringent test for applying the enhancement in § 2F1.1. *United States v. Kopshever,* 6 F.3d 1218 (7th Cir.1993). We have no reason to change our minds, nor is there any reason to believe that for some obscure reason in this context "or" means "and." See also *United States v. Wilson,* 41 F.3d 399 (8th Cir.1994).

■ Like many defendants these days, Randy has found new hope in the Double Jeopardy Clause. Relying on *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989); *Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), and *Dep't of Revenue of Montana v. Kurth Ranch,* —— U.S. ——, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994), he contends that the involuntary bankruptcy in which he was the debtor constitutes prior jeopardy. Therefore, he argues that the criminal indictment against him must be dismissed.

He is wrong. The bankruptcy was brought by creditors, not the government. The creditors were attempting to recover what he owed them—their aim, for what it's worth, was not to punish. A bankruptcy does not take from the debtor more than he owes his creditors. Even if it were, in fact, governmental action and therefore conceivably subject to the Double Jeopardy Clause, it would be analogous to the forfeiture of proceeds of a crime, rather than punishment. See *Smith v. United States,* 76 F.3d 879 (7th Cir.1996). It would also be an "offense" with different elements. The Double Jeopardy Clause can give no comfort to Mr. Randy.

Randy also claims that the court erred in imposing a fine and ordering restitution. He did not raise the issues below, and therefore they are reviewed only for plain error. *United States v. Burrows*, 48 F.3d 1011 (7th Cir.1995). No such error exists in this record. The sentence imposed on Mr. Randy is AFFIRMED.