**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 95-31305
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

PETER MCDERMOT, II and GORDON L RUSH, JR,

Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Louisiana

December 19, 1996

Before BARKSDALE, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Appellee Gordon L. Rush, Jr. was convicted of multiple counts of mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, and conspiracy to commit mail and wire fraud under 18 U.S.C. § 371. Appellee Peter McDermot II was convicted of two counts of wire fraud under 18 U.S.C. § 1343 and one count of conspiracy to commit mail and wire fraud under 18 U.S.C. § 371. The United States appeals from the district court's sentencing determinations entered after remand, arguing that the court erred in failing to increase Rush's and McDermot's offense levels under

United States Sentencing Guidelines § 2F1.1(b)(6) (Nov. 1991).

I

Rush was the president, chief executive officer, and principal stockholder of Presidential Fire & Casualty Company ("Presidential") from its incorporation in 1985 until its liquidation by the Louisiana Department of Insurance in 1991. McDermot became a director of Presidential in 1991.

Rush and McDermot were convicted for their roles in a scheme to infuse fraudulent securities into Presidential to disguise its insolvency and allow it to continue selling insurance policies. In particular, Rush was convicted of orchestrating various fraudulent transfers of municipal bonds, Federal National Mortgage Association certificates ("FNMAs") and Government National Mortgage Association certificates ("GNMAs"), and of making false representations on Presidential's financial statements and to various state boards of insurance. McDermot participated in the scheme by entering into a Surplus Contribution Agreement falsely purporting to sell more than $9 million in FNMAs and municipal bonds to Presidential.

After the trial but prior to sentencing, Judge George Arceneaux, Jr., who had presided over the trial and pre-trial proceedings, died, and the case was transferred to Judge Lansing L. Mitchell. After conducting a hearing and reviewing extensive memoranda filed by the parties, Judge Mitchell sentenced Rush to a forty-six-month term of imprisonment and imposed a $25,000 fine, a $950 special assessment, and a three-year term of supervised release. The court sentenced McDermot to a forty-one-month term of

imprisonment and imposed a $7,500 fine, a $150 special assessment, and a three-year term of supervised release.

Both Rush and McDermot appealed their convictions on various grounds, and the government cross-appealed, contending that the district court applied the sentencing guidelines incorrectly. In particular, the government argued that the district court erred in failing to apply, as to each defendant, a four-point enhancement for jeopardizing the safety and soundness of a financial institution under U.S.S.G. § 2F1.1(b)(6). We affirmed Rush's conviction, dismissed McDermot's appeal for want of prosecution, and vacated and remanded Rush's and McDermot's sentences for further proceedings. *United States v. McDermot*, No. 93-3603 (5th Cir, June 5, 1995) (unpublished). On remand, the district court again declined to apply the § 2F1.1(b)(6) enhancement. The government appeals again.

## II

We review *de novo* the district court's application of the Sentencing Guidelines, and we will affirm the court's factual findings unless they are clearly erroneous. *United States v. Clements*, 73 F.3d 1330, 1338 (5th Cir. 1996).

Section 2F1.1(b)(6) of the Guidelines provides: "If the offense substantially jeopardizes the safety and soundness of a financial institution . . . increase by 4 levels. If the resulting offense level is less than level 24, increase to level 24." U.S.S.G. § 2F1.1(b)(6)(A). Application Note 14 to § 2F1.1 defines "financial institution" to include an insurance company. The

commentary further states that:

> An offense shall be deemed to have "substantially jeopardized the safety and soundness of a financial institution" if, as a consequence of the offense, the institution became insolvent; substantially reduced benefits to pensioners or insureds; was unable on demand to refund fully any deposit, payment, or investment; was so depleted of its assets as to be forced to merge with another institution in order to continue active operations; or was placed in substantial jeopardy of any of the above.

U.S.S.G. § 2F1.1(b)(6), comment. (n.15). Guideline commentary is "controlling when it functions to interpret a guideline or explain how it is to be applied." *United States v. Radziercz*, 7 F.3d 1193, 1195 (5th Cir. 1993), *cert. denied*, ___ U.S. ___, 114 S. Ct. 1575, 128 L. Ed. 2d 218 (1994).

In its original sentencing determination, the district court explicitly rejected the government's assertion that Presidential was insolvent from its inception as a result of fraud because Rush founded the company using encumbered assets to satisfy certain statutory reserve requirements. Instead, it found that Presidential became insolvent prior to the fraud due to the failure of its reinsurer in 1986, and therefore rejected an enhancement for either Rush or McDermot under § 2F1.1(b)(6).

Application Note 15, however, lists four types of dangers to the safety of a financial institution, only one of which is insolvency. U.S.S.G. § 2F1.1(b)(6), comment. (n.15). *United States v. Krenning*, 93 F.3d 1257, 1270 (5th Cir. 1996); *cf. United States v. Bullard*, 13 F.3d 154, 158 n.10 (5th Cir. 1994) (noting that Application Note 10 to § 2B1.1(b)(7)(A), which is worded

-4-

identically to § 2F1.1(b)(6), "does not limit the meaning of the terms 'substantially jeopardized the safety and soundness of a financial institution' to the situation where the institution becomes insolvent as a consequence of the defendant's conduct"). Because we were unable to discern from the sentencing hearing transcript whether the district court considered and rejected the other three bases for enhancement, we vacated the sentence and remanded for consideration whether the fraud "substantially reduced benefits to . . . insureds" or whether Presidential was "unable on demand to refund fully any deposit, payment, or investment" as a result of the fraud, notwithstanding its prior insolvency.[1]

On remand, the district court reaffirmed its previous finding that the total loss attributable to the failure of the reinsurer was approximately $8 million and that "a fair assessment of the additional losses that could be attributed to the fraud" fell somewhere between $5 million and $10 million. In addition, the court specifically found that "[t]he $5 - $10 million total loss found by the Court to be attributable to the fraud, was, of course, in the form of unrefunded premiums and unpaid claims."

Notwithstanding these clear findings of fact, however, the district court again declined to increase Rush's and McDermot's offense levels. The court held that "[w]hile a strictly literal reading of the factors in Application Note 15 might seem to compel the application of the enhancement," the guideline compels the

---

[1]    The fourth basis for enhancement, where an institution is "so depleted of its assets as to be forced to merge with another institution," does not pertain to Presidential's situation.

enhancement only "if the offense *itself* substantially jeopardized the safety and soundness of a financial institution." The court concluded that once an institution becomes insolvent, it has no "safety" or "soundness" which may be substantially jeopardized. Presidential was already insolvent due to the failure of the reinsurer prior to the fraud, and well prior to McDermot's involvement in the conspiracy; therefore, the court concluded that Presidential's inability in the end to refund unearned premiums or pay claims did not trigger the enhancement.

We cannot agree. In the previous appeal, we considered the question of whether prior insolvency negates the possibility of a four-point enhancement and found that it does not. *McDermot*, No. 93-3603 at 24. Application Note 15 does not define safety and soundness solely in terms of the institution's solvency. A defendant who perpetrates fraud with respect to an already insolvent institution may still "substantially reduce benefits to . . . insureds" or cause the institution to be unable "on demand to refund fully any deposit, payment, or investment" over and above the consequences of the initial insolvency. Indeed, the district court so held in the original sentencing hearing, stating that "[w]ithout those [fraudulent securities] going on the books, I believe Presidential would have been shut down, and the loss would have been limited to something less than it wound up being." Although the language "as a consequence of the offense" mandates a causal connection between the fraud and the loss, we do not read this language to require that *all* losses associated with a given

-6-

institution be directly attributable to fraud. We therefore find that the court's legal conclusion that the enhancement does not apply is irreconcilable with its factual conclusion that $5 to $10 million in losses were caused by the fraud, *independent* of the initial failure of the reinsurer.

The language of § 2F1.1(b)(6) is mandatory, directing the court to "increase by 4 levels" if the factual predicates of the enhancement are met. *See United States v. Tello*, 9 F.3d 1119, 1129-30 (5th Cir. 1993) (holding that imperative clause in U.S.S.G. § 3E1.1 directing sentencing court to "decrease the offense level by 1 additional level" if certain factual predicates are determined eschews any court discretion to act otherwise); *United States v. Velgar-Vivero*, 8 F.3d 236, 242 (5th Cir. 1993) (holding that enhancement for obstruction of justice which uses similar mandatory language must be applied where factual predicates are satisfied), *cert. denied*, ___ U.S. ___, 114 S. Ct. 1865, 128 L. Ed. 2d 486 (1994), *and cert. denied*, ___ U.S. ___, 114 S. Ct. 2715, 129 L. Ed. 2d 840 (1994). Section 2F1.1(b)(6) and Application Note 15 instruct the court to increase the offense level where the defendant's actions substantially reduced benefits to insureds, rendered the institution unable to refund deposits or payments, or simply placed the institution in substantial jeopardy of the same. The district court erred in refusing to apply the mandatory enhancement to Rush and McDermot's sentences once it explicitly determined that $5 to $10 million in unpaid claims and unrefunded

premiums were directly attributable to the fraud.[2]

III

Rush asserts in the alternative that the district court explicitly effected a downward departure from the Guidelines when it refused to apply the four-point enhancement to his sentence. At the outset, we note that a refusal to apply an upward adjustment in a particular case does not constitute a downward departure from the guidelines. *United States v. Madison*, 990 F.2d 178, 183 (5th Cir. 1993) (noting that "adjustments" vary total applicable offense level and are generally mandatory, whereas "departures" disregard guideline sentences altogether in extraordinary circumstances and are inherently discretionary).

A sentencing court may depart from the applicable Guideline range after all appropriate adjustments have been made only if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b); *see* U.S.S.G. § 5K2.0, p.s. (noting district court's authority to depart from Guidelines under

---

[2]    Rush argues that the government failed to satisfy its burden of proof with respect to the enhancement. In particular, Rush asserts that the district court explicitly credited the expert who testified on his behalf and questioned the reliability and competence of Presidential's liquidators who testified on behalf of the government. The district court, however, took these credibility assessments into account when it determined that the total amount of loss attributable to the fraud fell between $5 and $10 million, rather than the $12 million urged by the government. Rush's argument, therefore, is a thinly-veiled attack on the district court's estimation of the loss. Rush challenged this determination in the initial appeal, and we upheld the court's calculation of loss as reasonable. Rush may not again challenge this finding in opposition to the government's appeal of his sentence after remand.

§ 3553(b)).  The Guidelines carve out a "'heartland' set of typical cases" and provide that when the sentencing court finds "an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether departure is warranted."  U.S.S.G. ch. 1, pt. A, intro. comment. 4(b).  When the court departs from the guideline  range, the court must offer specific reasons explaining why the departure is justified in terms of the policies underlying the sentencing guidelines.  *United States v. Mejia-Orosco*, 867 F.2d 216, 221 (5th Cir.), *cert. denied*, 492 U.S. 924, 109 S. Ct. 3257, 106 L. Ed. 2d 602 (1989).

In rejecting the four-point enhancement on remand, the district court concluded that "§ 2F1.1(b)(6)(A) should not be applied to enhance the sentence of a defendant in Rush's position where the defendant is charged with causing the failure of an institution that he set up and operated on his own behalf."  In the alternative, the court held that "even if it could be applied in such a case, it should not be applied to enhance the sentence of either Rush or McDermott [sic] in this particular case because of the reasons stated above and at the original sentencing."  The district court never explicitly indicated that it intended to depart from the Guidelines, but rather maintained that § 2F1.1(b)(6) simply does not apply in this case.  Accordingly, we find Rush's departure argument to be without merit.[3]

---

[3]     Moreover, we note that the neither Rush nor McDermot specifically requested a downward departure at sentencing.

-9-

We note, however, that the court found that Rush's ownership of Presidential presented an atypical circumstance inadequately considered by the Guidelines Commission in promulgating § 2F1.1(b)(6).[4] Thus, the district court could have intended to effectuate a departure on this basis.[5] Assuming that the court meant to depart from the Guidelines, however, the result would be the same.

We review a district court's decision to depart for abuse of discretion. *Koon v. United States*, ___ U.S. ___, ___, 116 S. Ct. 2035, 2043, 135 L. Ed. 2d 392 (1996). The district court opined that the Sentencing Commission did not intend for § 2F1.1(b)(6) to apply to a defendant who jeopardized the safety and soundness of an institution he himself established and of which he is the principal stockholder, as opposed to an outsider or mere employee of that institution. We discern no conceivable basis for this conclusion. Application Note 15 defines the relevant harm in terms of "substantially reduced benefits to . . . insureds" and inability to "refund fully any deposit, payment, or investment." The focus is not only on the institution *qua* institution, but also upon, among others, the harm that befalls policyholders who fail to receive the benefits for which they contracted. *Cf. Krenning*, 93 F.3d at 1270

---

[4] The district court did not make a similar finding with respect to McDermot.

[5] According to the Supreme Court's interpretation of Rule 32 of the Federal Rules of Criminal Procedure, the district court was required to provide notice to the government before *sua sponte* departing downward from the applicable guideline range. *See Burns v. United States*, 501 U.S. 129, 131 & 135 n.4, 111 S. Ct. 2182, 2183 & 2185-86 n.4, 115 L. Ed. 2d 123 (1991). The government did not object to lack of notice, however, and it does not raise the issue on appeal.

(interpreting § 2F1.1(b)(2) and holding that loss to individual insureds who buy insurance backed by insolvent institution, not loss to institution itself, is proper measure of harm). Policyholders and taxpayers who fund the associations that guarantee the policies are no less victimized when the failed insurance company is owned by the fraudfeasor than when an outsider perpetrates the fraud. Rush's ownership of Presidential does not take his case out of the heartland of typical cases under § 2F1.1(b)(6); therefore, a downward departure on this basis would have been improper.[6]

                                IV

For the foregoing reasons, we VACATE Rush's and McDermot's sentences and REMAND for application of the four-point enhancement under § 2F1.1(b)(6) and for resentencing in accordance with this opinion.

---

[6]      The district court notes that both the probation officer and the government contacted the Sentencing Commission directly concerning the § 2F1.1(b)(6) enhancement. The Commission initially stated that the enhancement applied only to a defendant who jeopardized an independent institution, but later retreated from this opinion, leaving its application to the discretion of the judge. The district court cited the Commission's own difficulty in applying the enhancement as support for the proposition that the Commission did not adequately consider the defendant's ownership of the jeopardized institution in promulgating the guideline. However, when determining whether a circumstance was adequately considered by the Commission, the court may "consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission," 18 U.S.C. § 3553(b); *Koon*, ___ U.S. at ___, 116 S. Ct. at 2044, not unofficial, post-hoc contacts with the Commission. We therefore find that the Commission's statements to the district court do not support the asserted basis for departure.