United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 18, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 03-10228

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

VERSUS

LISA L. DALE; KEVIN DEWAYNE SPENCER,

Defendants - Appellants.

Appeals from the United States District Court
for the Northern District of Texas

Before DAVIS, PRADO and PICKERING, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Defendant Kevin Spencer appeals his conviction and defendant Lisa Dale appeals her sentence on charges of securities fraud, wire fraud, money laundering and related charges. Based on our conclusion that the district court did not err in its disposition of trial matters raised by Spencer, nor did it err in applying the Sentencing Guidelines to Dale, we AFFIRM.

I.

Lisa Dale and Kevin Spencer, along with two co-defendants, were indicted on charges relating to a Ponzi scheme they ran. The two co-defendants pled guilty. Spencer was found guilty by a jury of one count of securities fraud (in violation of 15 U.S.C. §§ 1(a) & 77x and 18 U.S.C. § 2), one count of interstate transportation of stolen property (in violation of 18 U.S.C. §§ 2314 & 2), several counts of wire fraud (in violation of 18 U.S.C. §§ 1343 & 2), several counts of money laundering (in violation of 18 U.S.C. §§ 1956(a)(1)(A)(I) & 2) and several counts of

engaging in monetary transactions in property derived from specified unlawful activity (in violation of 18 U.S.C. §§ 1957 & 2). Dale was found guilty by a jury of two counts of securities fraud (in violation of 15 U.S.C. §§ 1(a) & 77x and 18 U.S.C. § 2), two counts of interstate transportation of stolen property (in violation of 18 U.S.C. §§ 2314 & 2), several counts of wire fraud (in violation of 18 U.S.C. §§ 1343 & 2), and several counts of money laundering (in violation of 18 U.S.C. §§ 1956(a)(1)(A)(I) & 2).

The charges arose from a Ponzi scheme. We focus on Spencer's role in the transaction because only he raises sufficiency of the evidence issues on appeal. Dale and a co-defendant started Progressive Financial Services and Group ("Progressive") as a check cashing company. Progressive was used to solicit investors for the check cashing business and later for trading programs promising investment in foreign capital markets and various commodities. Few investments were made and most of the funds were used on personal luxuries and to perpetuate the Ponzi scheme. Eventually Progressive filed bankruptcy, listing the principal and interest owed to the investors as liabilities.

Spencer owned and ran Spencer Mortgage, a company specializing in serving people with bad credit. After Spencer and Dale became acquainted through one of the other co-defendants, Spencer agreed to let Progressive use its Spencer Mortgage bank accounts for a fee. Before Progressive funds from investors were deposited, the Spencer Mortgage account had a negative balance. Spencer made deposits, gave Progressive investors wiring instructions over the phone and sent confirmations that he had received wire transfers. Over $5 million in investors' funds went into the Spencer Mortgage accounts. Spencer wrote checks to investors for false returns out of the accounts. He also wrote checks for cars, boats and houses using these funds. Spencer

2

took $581,865.20 of the investors' funds for himself, including $200,000 for a house after investors began questioning why they had not been paid as promised. Spencer also used $17,200 of the funds to pay an old business debt. Spencer prepared a letter containing false information about Spencer Mortgage for a co-defendant to use for marketing purposes. He attended sales pitches by the co-defendant and did not correct the lies told to investors.

Dale and Spencer were sentenced to 78 months in prison and 3 years supervised release and ordered to pay special assessments. Dales's Presentence Report did not include an enhancement under U.S.S.G. § 2F1.1(b)(6)(A), which applies to a defendant whose offense substantially jeopardizes the safety and soundness of a financial institution. The government objected to the PSR and Addendum because this enhancement was omitted. The district court sustained the objection noting that although the court was unable to find any federal case law addressing the issue, it concluded that Progressive appears to fall within the definition of a financial institution.

Spencer and Dale appeal.

## II.

Spencer raises several trial related issues as a challenge to his conviction.

## A.

Spencer argues first that the district court erred in denying his motion to sever his trial from that of Lisa Dale. We review that decision for abuse of discretion. United States v. Nutall, 180 F.3d 182, 186 (5th Cir. 1999). In order to prevail, Spencer must show that "(1) the joint trial prejudiced him to such an extent that the district court could not provide adequate protection; and (2) the prejudice outweighed the [G]overnment's interest in economy of judicial

administration." United States v. Solis, 299 F.3d 420, 440 (5th Cir. 2002), cert. denied, 537 U.S. 1060 (2002) (quoting United States v. Richards, 204 F.3d 177, 193 (5th Cir.), cert. denied, 531 U.S. 826 (2000)). Spencer claims that the jury was exposed to a significant amount of testimony dealing with his co-defendant whose role in the crime was broader than his. However, joinder is proper where a single scheme to defraud is carried out through the operations of different companies, even if a defendant not connected with all of the companies is charged on only some of the substantive counts. United States v. Chavis, 772 F.2d 100, 111 (5th Cir. 1985). Also, disparity in the amount of evidence presented against co-defendants does not justify severance in the absence of a showing of prejudice. United States v. Hogan, 763 F.2d 697, 705 (5th Cir. 1985). Spencer makes only a general claim of prejudice by spill-over effect. This does not rise to the level to outweigh the government's interest in judicial economy. The district court did not abuse its discretion in denying Spencer's motion to sever.

B.

Spencer argues next that the district court abused its discretion in admitting, as extrinsic evidence, evidence that Spencer used investors' money to repay an overdue business debt. The district court admitted the testimony of Sharon Brock concerning a $17,200 wire transfer she received from Spencer from investor funds. Brock also testified that Spencer sent her the money because she had invested the funds with Spencer and that Spencer offered her a 200% return on her investment. These facts were not part of the scheme charged in the indictment. Spencer contends that this is extrinsic evidence because Spencer was not charged with defrauding Brock. The government contends that this is not extrinsic evidence because it was presented to show that Spencer was using the investor's funds, which should have been invested as promised, to instead

4

repay a loan unrelated to the investment programs. The admission of this evidence is reviewed for abuse of discretion. United States v. Buck, 324 F.3d 786, 790 (5th Cir. 2003).

Brock's testimony is not extrinsic evidence. Rather it is intrinsic as it was presented to show the nature of the Ponzi scheme in that Spencer used investors' funds to repay a loan unrelated to the investment programs. Evidence is intrinsic and admissible when it and the crime charged are intertwined, both acts are part of the same criminal episode or the other act was a necessary preliminary to the crime charged. United States v. Torres, 685 F.2d 921, 924 (5th Cir. 1982). The district court appropriately limited this testimony to avoid the mention of fraud. No error resulted from the admission of this testimony.

C.

Spencer argues that the district court erred in failing to compel the government to disclose FBI Form 302s to Spencer under the Jencks Act, Brady or Giglio. Before and during the trial Spencer made requests for FBI Form 302s under its request for Brady, Giglio and Jencks Act material. Brady v. Maryland, 373 U.S. 83 (1963)(exculpatory material); Giglio v. United States, 405 U.S. 150 (1972)(material that would impeach a government witness); Jencks Act, 18 U.S.C. § 3500 (statements of any witness). At trial Spencer asked that the forms for each witness be reviewed *in camera* to see if they contained any such material. The court reviewed them and determined (with one small exception) that they contained no material required to be disclosed. Spencer now requests that this court review the sealed Form 302s to determine whether they contain Jencks, Brady or Giglio material and thus whether the district court erred in refusing the compel the government to produce them to the defense. If the district court erred, Spencer submits that reversal of his conviction is required.

The district court's conclusion that a document does not contain a Jencks Act "statement" is reviewed for clear error. 18 U.S.C. § 3500. United States v. Brown, 303 F.3d 582, 591 (5th Cir. 2002), cert. denied, 537 U.S. 1173 (2003). A denial of a discovery request is reviewed for abuse of discretion. United States v. Gonzalez, 466 F.2d 1286, 1288 (5th Cir. 1972).

The government argues that a defendant seeking *in camera* inspection to determine whether documents contain Brady material must make a "plausible showing" that the file will produce material evidence. United States v. Lowder, 148 F.3d 548, 550-551 (5th Cir. 1998); United States v. Martin, 565 F.2d 362, 364 (5th Cir. 1978). Also, to obtain production of a statement under the Jencks Act, the defendant must make a preliminary showing that there is a producible document. United States v. Edwards, 702 F.2d 529, 531 (5th Cir. 1983). Spencer makes no claims as to what the forms may contain. The district court nevertheless carefully reviewed the documents in question and determined, with minor exceptions, that they did not qualify as Jencks Act material and did not contain material required to be disclosed under Brady or Giglio. Our own independent review confirms these conclusions and we find no error in the district court's disposition of this issue.

D.

Spencer asserts that the evidence was insufficient to convict him of the crimes charged. Specifically, Spencer argues that the evidence was insufficient to prove that he knew of the fraudulent scheme, that he knew that the money in the Spencer Mortgage account was obtained by fraud or that he intended to participate in the fraudulent scheme. Lack of proof of these elements would negate his convictions. Essentially, Spencer is claiming that he had no knowledge of the fraudulent nature of his co-defendants' activities and that he simply acted on the orders of

6

the others whom he viewed as his superiors in a legitimate business. He also claims that he did not lie to investors and that the co-defendants gave instructions to investors to wire funds into his account without his authorization.

The following evidence in the record supports Spencer's convictions. Spencer made the first deposit of investors' funds into his account. He took no steps to prevent the co-defendants from using his account. Spencer also did not return the money that "appeared in his account" without his permission. Rather he was paid a fee and used the money in the account for personal luxuries including a home and a car. Spencer lied about the size and success of Spencer Mortgage and did not correct lies told to investors by his co-defendants. Spencer was in a position to see the investors' funds going into the account with no investment income. He wrote checks to investors which led them to believe they were earning a return on their money. Spencer also took $100,000 from money that an investor asked him to return.

The above outlined evidence is clearly sufficient to support a conclusion that Spencer knew of the fraudulent nature of the scheme and intended to participate. Accordingly, we find no merit to Spencer's claim of insufficient evidence.

### E.

Spencer's final complaint is that the district court improperly instructed the jury in conjunction with the wire fraud counts that a defendant is criminally liable for acts he did not engage in based on participation in a joint scheme where the extraneous acts are a reasonably foreseeable consequence of the scheme. As Spencer objected to the instruction, this court reviews for abuse of discretion. United States v. Daniels, 281 F.3d 168, 183 (5th Cir. 2002), cert. denied, 535 U.S. 1101 (2002). The question is whether the "charge, as a whole is a correct

7

statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to factual issues confronting them."  Id.

There is no merit to the claim.  As Spencer acknowledges, the challenged instruction follows the Fifth Circuit Pattern Criminal Jury Instruction for "Conspirator's Liability for Substantive Count."  Spencer's complaint is that the second prong of the instruction, covering acts (presumably use of wires) that are a reasonably foreseeable consequence of the scheme, goes beyond the principle that co-conspirators are responsible for acts in furtherance of the scheme. However, the instruction given is a correct statement of the law.  "One 'causes' the mail to be used when one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended."  United States v. Finney, 714 F.2d 420, 423 (5th Cir. 1983), citing  United States v. Kenofskey, 243 U.S. 440, 37 S. Ct. 438, 61 L. Ed. 836 (1917).   The charge as given was proper.

III.

Dale's sole issue on appeal relates to a four-level increase imposed pursuant to U.S.S.G. § 2F1.1(b)(6)(A) (1997).  Under that provision, if the offense "substantially jeopardized the safety and soundness of a financial institution," the defendant's offense level is increased by 4 levels and if the resulting offense level is less than 24, the offense level is increased to 24.  Application Note 14 defines "financial institution" as follows:

> "Financial institution," as used in this guideline, is defined to include any institution
> described in 18 U.S.C. § § 20, 656, 657, 1005-1007, and 1014; any state or
> foreign bank, trust company, credit union, insurance company, *investment
> company*, mutual fund, saving (building and loan) association; union or employee
> pension fund; any health, medical or hospital insurance association; *brokers and*

8

*dealers* registered, or *required to be registered, with the Securities and Exchange Commission*, futures commodity merchants and commodity pool operators registered, or required to be registered, with the Commodity Futures Trading Commission; and any similar entity, whether or not insured by the federal government. (Emphasis added).

Dale argues that Progressive is not a "financial institution" and that the Sentencing Commission exceeded the Congressional directive in FIRREA by including nonfederally insured entities in the definition of "financial institution."

A.

Dale's Presentence Report did not include the enhancement because the probation office concluded that Progressive was simply a vehicle used to commit the securities fraud and was not a legitimate investment company making legitimate investments. The government objected and the district court sustained the objection upon finding that Progressive falls within the definition of a financial institution. The district court stated its belief that whether or not the company conducted itself as a legitimate investment company was irrelevant. It found that Progressive was an investment company and sold or attempted to sell securities nationwide. The district court also found that one of the co-defendants qualified as a broker/dealer and that the misapplication of the funds received from those sales resulted in the insolvency of Progressive. We review the district court's factual findings for clear error, United States v. Texas, 168 F.3d 741, 752 (5th Cir. 1999), and its application and interpretation of the Sentencing Guidelines de novo. United States v. Montoya-Ortiz, 7 F.3d 1171, 1179 (5th Cir. 1993).

Dale makes three arguments that Progressive is not a financial institution. First, she argues that Progressive was not a legitimate organization, it was merely a Ponzi scheme and the guideline was meant to punish those who harm legitimate, sound financial institutions by their

fraudulent conduct. The Seventh Circuit rejected this argument in <u>United States v. Randy</u>, 81 F.3d 65, 67-68 (7th Cir. 1996). In <u>Randy</u>, the defendant had founded a phony (unlicensed) bank and used it as a vehicle to defraud his investors. Finding it to be a financial institution for purposes of this sentencing guideline, the Seventh Circuit said "when it walks and talks like a financial institution, even if it's a phony one, it is, in our view, covered by § 2F1.1(b)(6)." <u>Id.</u> We agree. In connection with this argument, Dale argues that because the co-defendants owned Progressive, the purpose of the provision does not apply because it was victimized by their own conduct. This court has rejected that position. <u>United States v. McDermot</u>, 102 F.3d 1379, 1384 (5th Cir. 1996), states that there is "no conceivable basis" for a conclusion that "the Sentencing Commission did not intend for § 2F1.1(b)(6) to apply to a defendant who jeopardized the safety and soundness of an institution he himself established." <u>McDermott</u> also points out that the focus is not "only on the institution *qua* institution" but also on others who fail to receive the benefits for which they contracted. Application Note 15 to 2F1.1(b)(6) notes that an offense shall be deemed to have substantially jeopardized the safety and soundness of a financial institution if as a consequence of the offense, the institution was "unable to refund fully any deposit, payment or investment." That is certainly the case with Progressive.

Dale also argues that Progressive was not an investment company because it did not make any investments. There is no definition of investment company in the guidelines or related statutes. However, Progressive held itself out as an investment company. It solicited investments for the check cashing business and for trading programs involving investments in foreign capital markets and various commodities. We agree with the district court that whether the company actually made any investments is irrelevant.

10

Dale argues finally that Progressive was not a financial institution because it was not, as the government argued, a "broker or dealer . . . required to be registered with the Securities and Exchange Commission." Because we conclude that Progressive qualifies as a financial institution for purposes of this guideline provision because it was an investment company, we need not consider this argument. However, we note that the definition of broker and the underlying definition of security are broad enough to encompass Progressive. Under the Security Exchange Act, the "term 'broker' means any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4). A "security" is broadly defined to include a long list of investment devices. 15 U.S.C. § 78c(a)(11). The basic test laid down by the Supreme Court in SEC v. W. J. Howey Co., 328 U.S. 293 (1946), is whether "the person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." As described by Dale, Progressive solicited persons throughout the United States and Puerto Rico to invest money in trading programs. They represented to investors that Progressive was a lucrative check cashing business, obtaining profits of 50 percent for short term loans to individuals and that it could pay investors 25 to 50 percent per month from its profits from the loans to individuals. Progressive represented that these returns were guaranteed. The investment programs Progressive offered to investors, although fraudulent, clearly fall within the definition of a security. Since Progressive sold securities for the account of others, its investors, it was a broker. Section 15(a)(1) of the Securities Exchange Act requires brokers to register with the SEC. 15 U.S.C. § 78c(a)(1). An expert testified on these points at the sentencing hearing. The district court's conclusion that Progressive was a financial institution on this basis was correct.

11

In summary, Progressive presented itself as an investment company to its victims. Also, the trading programs it offered were securities and Progressive was a broker under securities laws. These facts provide two separate bases under which the company falls squarely within the definition of a financial institution as set forth above. The fact that the investment company was a sham and that the financial institution victimized was owned by the defendants does not prevent it from falling within the enhancements called for in § 2F1.1. The harm caused by Progressive, losses to its investor victims, was the type of harm contemplated by the phrase "jeopardized the safety and security of the financial institution" as set forth in the Application Notes. This enhancement was correctly applied. [1]

B.

Dale also argues that the Sentencing Commission exceeded the Congressional directive in FIRREA by including nonfederally insured entities in the definition of "financial institution" in U.S.S.G. § 2F1.1(b)(6)(A). In Section 961(m) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. 101-73, Congress directed the Sentencing Commission to promulgate guidelines to provide for a "substantial period of incarceration for a violation of, or a conspiracy to violate, section 215, 656, 657, 1005, 1006, 1007, 1014, 1341, 1343 or 1344 of title 18, United States Code, that substantially jeopardizes the safety and soundness of a <u>federally insured financial institution.</u>" (Underlining added.) The guideline enacted in response to this directive, § 2F1.1 specifically covers non-federally insured financial institutions in the definition of financial institution. The Background of U.S.S.G. §

---

[1] Dale's argument against the application of this enhancement based on recent amendments to the 2B1.1(b)(12)(B), the successor guideline to U.S.S.G. § 2F1.1(b)(6)(A), are without merit.

12

2F1.1(b)(6)(A) (1997), states that "Subsection (b)(6)(A) implements, in a broader form, the instruction to the Commission in Section 961(m) of Public Law 101-73." Two cases from other circuits have held that given the Sentencing Commission's broad authority to promulgate guidelines for sentences and its specific statement that it was exercising it in this situation to enact a rule that was broader than the Congressional referenced directive, the Commission did not exceed its authority in enacting the definition of financial institution in § 2F1.1. United States v. Lauer, 148 F.3d 766, 769 (7th Cir. 1998); United States v. Ferrarini, 219 F.3d 145, 160 (2d Cir. 2000). This circuit has noted that the language in the Background Note ("in broader form") indicates that the Commission is exercising its authority to define an offense beyond a specific directive of Congress. United States v. Soileau, 309 F.3d 877, 881 (5th Cir. 2002). Accordingly, we conclude, following the 7th and 2d Circuits, that the promulgation of this provision was within the authority of the Sentencing Commission.

## IV.

For the foregoing reasons, Spencer's conviction and Dale's sentence are AFFIRMED.

13