In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-2801

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TRACEY HARTZ,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 9—**George W. Lindberg,** *Judge.*

ARGUED FEBRUARY 22, 2002—DECIDED JULY 16, 2002

Before POSNER, KANNE and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Tracey Hartz pled guilty to mail
fraud in violation of 18 U.S.C. § 1341, and insurance fraud
in violation of 18 U.S.C. § 1033. In his plea agreement, he
retained the right to appeal his sentence and now argues
that the district court erred in applying an increase to his
offense level under United States Sentencing Guideline
§ 2F1.1(b)(8)(B). We affirm.

## I.

Tracey Hartz was licensed as both an attorney and a real
estate broker in the State of Illinois. He was a "member

attorney" of Attorney Title Guarantee Fund, an organization in the business of providing title insurance in connection with real estate transactions. As a member attorney, Hartz signed an agreement to act as an agent of Attorney Title at real estate closings. In the course of its business, Attorney Title issued checks to be distributed at real estate closings to the parties involved in the transaction. In a typical transaction, an attorney conducting a closing would distribute the checks to the appropriate parties and place into the attorney's own escrow account any funds received from the buyer or the lender that financed the purchase.

Hartz devised a scheme to defraud Attorney Title by fabricating real estate transactions and generating paperwork with the names of real and fictitious buyers, sellers, and financiers as well as real and fictitious properties. Using these phony deals, Hartz caused Attorney Title to generate and deliver to him checks payable to himself and other entities supposedly involved in the transaction. No actual exchange of properties or refinancing ever occurred, however, and Hartz deposited many of the checks in his personal account at Bank One.[1] Hartz forged endorsements on a number of these checks in order to deposit them at Bank One. Some checks were accepted by Bank One without endorsements. Hartz also induced Attorney Title to issue checks to third parties to pay off Hartz's personal debts. He kept the scheme going for a number of years by using subsequent phony transactions to repay some of the money he received from earlier transactions. All in all, he completed approximately 240 fake real estate deals and caused Attorney Title to provide him with checks in excess of $67

---

[1] At the time of these events, Hartz's bank was the First National Bank of Chicago. First National Bank of Chicago eventually became known as Bank One through a series of transactions that are irrelevant here, and we will refer to the bank as Bank One for simplicity's sake.

million. Hartz netted about $1.5 million from the scheme, and all of that money came from the coffers of Attorney Title.

In April 1998, Attorney Title discovered that Hartz had failed to send title insurance policies on his real estate closings. Attorney Title therefore stopped providing Hartz with title commitment letters for his real estate closings. A few months later, Attorney Title realized Hartz was using improper commitment numbers, confronted Hartz and decided to stop doing business with him until they could conduct an audit. When they told Hartz about the audit, he composed a 24-page document that was part confession and part suicide note, and attempted to kill himself. When his attempt failed, he confessed fully and took steps to make restitution.

After the scheme was discovered, Attorney Title brought suit against Bank One in the Circuit Court of Cook County. The suit alleged breach of contract claims based on Bank One's acceptance of checks drawn on Attorney Title's bank over improper endorsements. Although Bank One denied liability, it eventually paid Attorney Title $150,000 to settle the claims. At the same time, Bank One agreed to release all claims it had against Hartz. With the aid of his parents, Hartz repaid Attorney Title all of the money he had taken in his fraudulent scheme.

Hartz pled guilty to two counts of a seven-count indictment in exchange for the government's offer to dismiss the remaining five counts. In particular, he admitted he had engaged in mail fraud in violation of 18 U.S.C. § 1341, and insurance fraud in violation of 18 U.S.C. § 1033. In the plea agreement, the parties disagreed about the application of a number of sentencing provisions, and Hartz retained his right to appeal his sentence. The main source of disagreement, and the one that Hartz now raises on appeal, was the

applicability of USSG § 2F1.1(b)(8)(B).[2] This section pro-
vides, in relevant part:

> If the offense . . . affected a financial institution and the
> defendant derived more than $1,000,000 in gross re-
> ceipts from the offense, increase by **4** levels. If the re-
> sulting offense level is less than level **24**, increase to
> level **24**.

Originally, the government claimed that Attorney Title was
an affected financial institution and that because Hartz
derived more than $1 million from Attorney Title, the en-
hancement should apply. Hartz objected to the characteriza-
tion of Attorney Title as a financial institution, and eventu-
ally the government shifted its argument. In the end, the
government maintained that the enhancement was applica-
ble because Bank One was affected by Hartz's offense, and
that Hartz derived more than $1,000,000 from his offense.
In response to this refashioned argument, Hartz main-
tained that the enhancement did not apply unless the
$1,000,000 was derived from the financial institution; be-
cause Bank One paid out only $150,000 to extract itself
from Hartz's fraud, he contended the enhancement could
not apply. Ultimately, the district court found that the plain
language of the guideline did not require a link between the
effect on the financial institution and the amount of the

---

[2] At the time of Hartz's offense, the guideline in question was
found at USSG § 2F1.1(b)(7)(B). Before that time, it had been
codified at USSG § 2F1.1(b)(6)(B). It was subsequently renum-
bered as USSG § 2F1.1(b)(8)(B) without modification to its con-
tent, and that was its numbering at the time Hartz took his
appeal. Later still, as we shall discuss, the provision was modified
and renumbered as USSG § 2B1.1(b)(12)(A). For simplicity's sake,
we shall refer to the guideline in effect at the time of Hartz's sen-
tencing as USSG § 2F1.1(b)(8)(B). We note this repeated renum-
bering because many of the cases addressing these issues use the
prior numbering schemes.

fraud. Although a proposed amendment to the guideline (a proposal that was subsequently enacted) did require such a link, the court found that the proposed change merely reinforced its reading of the then-current guideline. The court found that Bank One was affected by Hartz's fraud because Hartz used the bank to commit the fraud and because the bank was forced to settle claims brought against it by Attorney Title. The court also found that Hartz derived more than $1 million from the offense, and therefore satisfied both prongs of the guideline, raising his offense level to 24 before additional enhancements and reductions were calculated. Ultimately, the district court sentenced Hartz to a term of 46 months' imprisonment. Hartz appeals.

## II.

Guidelines interpretations are questions of law, and we therefore review the district court's ruling *de novo. United States v. Parolin*, 239 F.3d 922, 928 (7th Cir. 2001), *cert. denied*, 533 U.S. 923 (2001); *United States v. Gee*, 226 F.3d 885, 899 (7th Cir. 2000). On appeal, Hartz argues that Section 2F1.1(b)(8)(B) should not apply unless a defendant derives more than $1 million from a financial institution. In effect, Hartz maintains that the two prongs of the guideline should be linked together. He contends that a proposed (and subsequently enacted) amendment to Section 2F1.1 clarified that a defendant must have taken $1 million from a financial institution in order to have "affected" that financial institution. He also argues that the literal interpretation of the guideline applied by the district court contravenes the guideline's context, purpose and legislative history. The government responds that the bank was affected because Hartz used the bank to commit his fraud and, in doing so, exposed the bank to enormous liability, including the $150,000 Bank One paid to settle the claims brought by Attorney Title. According to the government, the subsequently enacted amendment was a substantive change rather than

a clarification of the guideline and therefore may not be used to calculate the defendant's sentence.

Normally, a district court should apply the guideline in effect at the time of the sentencing. *United States v. Fones*, 51 F.3d 663, 669 (7th Cir. 1995). The guideline in effect at the time of Hartz's sentencing was § 2F1.1(b)(8)(B). We may, under certain circumstances, consider later amendments to the guidelines but we may apply later amendments only to the extent that they are clarifying rather than substantive changes to the guideline. *Id*.; USSG § 1B1.11(b)(2). We begin then by comparing the most recent version of the provision, currently listed at USSG § 2B1.1(b)(12)(A) to the guideline in effect at the time Hartz was sentenced:

> If the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, increase by **2** levels.

*See* USSG § 2B1.1(b)(12)(A). At the time Hartz was sentenced, the guideline provided:

> If the offense . . . affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense, increase by **4** levels. If the resulting offense level is less than level **24**, increase to level **24**.

*See* USSG § 2F1.1(b)(8)(B).

Some of the factors we consider in determining if an amendment is a clarification rather than a substantive change are: (1) how the Sentencing Commission characterized the amendment; (2) whether the amendment changes the language of the guideline itself or changes only the commentary for the guideline; and (3) whether the amendment resolves an ambiguity in the original wording of the guideline. *See Fones*, 51 F.3d at 669; *Ebbole v. United States*, 8 F.3d 530, 538-39 (7th Cir. 1993), *cert. denied*, 510

U.S. 1182 (1994). The Sentencing Commission offered the following explanation for the amendment:

> The enhancement also was modified to address issues about what it means to "affect" a financial institution and how to apply the enhancement to a case in which there are more than one financial institution[s] involved. Accordingly, the revised provision focuses on whether the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense.

Supplement to Appendix C, Amendment 617, at 184. The Sentencing Commission thus did not characterize the amendment as a clarification but rather as a modification and revision.

Moreover, the amendment changed the plain language of the guideline. The guideline in effect at the time of the sentencing unambiguously required only that the crime affect a financial institution and that the defendant derive a certain amount from the *offense*. In the newer version, the gross receipts are to be derived from the *financial institution*. There is nothing ambiguous about the version the district court applied and even Hartz agrees that a literal reading of the guideline favors the district court's interpretation. *See United States v. Greene*, 212 F.3d 758, 761 (3d Cir. 2000) (under a plain reading of the guideline, "[t]he requirement that a financial institution be affected and the requirement that the defendant derive more than $1 million in gross receipts from the offense are separate and distinct prerequisites."); *United States v. Monus*, 128 F.3d 376, 397 (6th Cir. 1997), *cert. denied*, 525 U.S. 823 (1998) ("The plain language of the Guidelines indicates that the defendant must derive a million dollars from the offense, not from the financial institutions."). The amendment thus substantively changes the requirements for applying the guideline by focusing on the amount derived from the financial institutions rather than the amount derived from the offense as a whole. Because the amendment substantively changes an

unambiguous provision and because the Sentencing Commission did not characterize the amendment as a clarification, we agree that the amendment should not be applied in sentencing Hartz.

That leaves the question, though, of whether the government has adequately shown that Hartz "affected" a financial institution. In this case, the government argues that Hartz affected Bank One by using the bank to actually facilitate the crime and by exposing the bank to liability for accepting his forged and sometimes unendorsed checks for deposit. As we discussed, Bank One settled a claim brought against it by Attorney Title for $150,000 as a result of Hartz's fraudulent activities at the bank. We need not determine the outer limits of the meaning of "affected" today because Hartz's fraud clearly affected Bank One. Hartz used the bank to commit the fraud and as a result, the bank was forced to pay $150,000 to Attorney Title to extract itself from civil liability for its actions in inadvertently assisting Hartz's scheme. This was not an insubstantial amount. Moreover, Hartz funneled $67 million in fraudulently obtained checks through the bank; had the fraud been discovered at some other point in time, the liability to the bank may have been even greater. Indeed, the offense would not have succeeded without the use of the bank to facilitate the crime. Finally, several of our sister circuits have held that the effect need not be direct so long as the bank is victimized by the offense. *See United States v. Bennett*, 252 F.3d 559, 566 (2d Cir. 2001), *cert. denied*, 122 S. Ct. 1307 (2002) (bank "affected" for the purposes of the guideline when fraudulent bank loans facilitated the fraud scheme that allowed defendant to shift millions of dollars from one company to another and then into his personal accounts, even though he did not benefit directly from the loans); *United States v. Johnson*, 130 F.3d 1352, 1355 (9th Cir. 1997) (embezzlement "affected" bank in both financial and non-financial ways including through damages to bank's reputation, its employee morale, and its customer relations);

*United States v. Schinnell*, 80 F.3d 1064, 1070 (5th Cir. 1996) (financial institution had been "affected" where the defendant engaged in an extensive fraudulent scheme using forged signatures, fraudulent endorsements and wire transfers all presented to banks in order to induce the banks to advance funds). *See also United States v. Kopshever*, 6 F.3d 1218, 1221 (7th Cir. 1993).

There is no need to go beyond the plain language of the guideline here, but we will respond to Hartz's other two arguments briefly. Hartz maintained that the district court's reading of the guideline was inconsistent with its purpose and legislative history. Hartz correctly points out that the guideline was enacted as a result of Congress' desire to punish crimes against financial institutions more heavily than the same crimes when directed to other victims. *See United States v. Lauer*, 148 F.3d 766, 769 (7th Cir. 1998). There is nothing in our interpretation that runs contrary to this intent. Under our formulation, the guideline punishes crimes of a certain magnitude that victimize financial institutions. We also reject Hartz's claim that the detrimental effect on Bank One was caused by the bank's own negligence in accepting the forged endorsements and unendorsed checks. Hartz is in no position to blame one of the victims of his scheme for falling prey to his fraud. *See Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 625 (7th Cir. 2000) (contributory negligence is not a defense to fraud). The district court correctly interpreted and applied the enhancement.

AFFIRMED.

A true Copy:

     Teste:

          _____
          *Clerk of the United States Court of Appeals for the Seventh Circuit*