# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-2987

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RICHARD J. COLLINS,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 831—**Suzanne B. Conlon**, *Judge.*

———————

ARGUED JANUARY 28, 2004—DECIDED MARCH 15, 2004

———————

Before MANION, DIANE P. WOOD, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* Richard Collins and others incorporated Gateway Association, Inc., and used it as a conduit to fraudulently raise millions of dollars from unsuspecting investors. Much of the money he kept for his own use or transferred to benefit friends. Once caught and charged, he pleaded guilty to two counts of mail fraud and was sentenced to ten years in prison. On appeal, Collins challenges a four-level increase in his sentence, claiming that Gateway was improperly labeled a financial institution under U.S.S.G. § 2F1.1(b)(6). We affirm.

In November 1997, Richard Collins and his confederates incorporated Gateway Association, Inc., in Illinois. Collins used numerous "finders" who were paid to locate prospective investors and bring them to Gateway's meetings. At these meetings, Collins and others promoted Gateway as an investment company primarily involved in the international trading of bank instruments. Investors were told that, once they paid a $2,500 fee to become Gateway members, they were eligible for various benefits, including discounts on shopping, hotels, and health care. Members would also be able to invest in the bank debenture trading program, which Collins promised would result in a risk-free return of as much as 1,250%. Promises that seemed too good to be true in fact turned out to be totally false. Gateway had no investment program or discount program; the company was part of Collins's scheme to defraud investors for his own personal gain.

For a while the scheme worked. From November 1997 to April 1999, Gateway received almost $11 million from at least 400 investors. In the process of collecting these large sums, Collins had to scramble to conceal the fraud. When an investor would question the progress of an investment, Collins would assure the individual that "a specialist recovery team" had been assembled to recover his funds and that the money would be returned in the very near future. On at least one occasion, Collins also returned a portion of an investor's principal as a show of good faith. Of course Collins had no intention of returning most of the money, as he had already spent approximately $634,000 of Gateway funds on personal items and had withdrawn over $1,120,000 in cash from various Gateway accounts. Collins and others also moved investor funds to the accounts of friends and to overseas locations to conceal the misappropriation. Little of this money would ever be recovered.

In March 2003 Collins was charged with three counts of mail fraud and one count of wire fraud. He eventually pleaded guilty to two of the mail fraud counts. The plea agreement stipulated that the 1997 edition of the sentencing guidelines applied to the offense and that former U.S.S.G. § 2F1.1 was the applicable sentencing provision. However, the parties disputed whether Collins's offense level should be increased by four levels for "substantially jeopardiz[ing] the safety and soundness of a financial institution," or "affect[ing] a financial institution and . . . deriv[ing] more than $1,000,000 in gross receipts from the offense." *See* U.S.S.G. § 2F1.1(b)(6) (1997)[1]. The government argued in favor of the four-level adjustment on the premise that Gateway was a financial institution within the meaning of the guideline and that Collins's fraudulent conduct caused Gateway to become insolvent.

In preparing the presentence investigation report, Collins's probation officer initially disagreed with the government's position because he believed that § 2F1.1(b)(6) applied only to legitimate financial institutions, not shell corporations. But after reading our decision in *United States v. Randy*, 81 F.3d 65 (7th Cir. 1996), he agreed with the government that the guideline covers corporations founded for fraudulent purposes and thus recommended the four-level increase. Collins made three related objections to the presentence report: (1) Gateway was not a "financial institution" within the meaning of the guideline because it was never officially licensed or registered as an investment

---

[1] This guideline upward adjustment has changed locations several times. At the time of Collins's offense, it was found at § 2F1.1(b)(6). It was later renumbered to § 2F1.1(b)(7), § 2F1.1(b)(8), and finally § 2B1.1(b)(12), its current location. For simplicity, we refer to the adjustment as § 2F1.1(b)(6).

company, and Gateway acted more as a discount club than an investment company; (2) investment companies cannot be considered "financial institutions" within the meaning of the guideline because Congress did not define them as such when it authorized the guideline in the Crime Control Act of 1990; (3) Collins's actions did not "affect" Gateway or "substantially jeopardize" Gateway because Gateway was the vehicle for the fraud, not a victim of it.

At sentencing in July 2003 the district court overruled Collins's objections. The court agreed with the government that Gateway was a financial institution that had been substantially jeopardized by Collins's actions:

> . . . . The guideline provides for a four-level increase when a defendant's conduct jeopardizes a financial institution, as that term is used in the guidelines and as that provision is interpreted by the Seventh Circuit, a company that holds itself out as an investment company does constitute a financial institution under the guidelines.

> As for Gateway, Gateway didn't perpetrate this fraud. The defendant and his cohorts did. Gateway, at one point, was a solvent entity because of the millions of dollars that a lot of victims invested based on these misrepresentations. And certainly the solvency of Gateway was not only affected, it was destroyed by the fraud. So the four-level enhancement does apply and the objection is overruled.

The court's decision to apply the adjustment had a significant effect on Collins's sentence. The additional four levels gave Collins a total offense level of 30, and with a Criminal History Category of III the resulting prison range was 121 to 151 months rather than 78 to 97 months. How-

ever, because the two counts to which Collins pleaded guilty had a combined maximum penalty of ten years' incarceration, *see* 18 U.S.C. § 1341 (1997), the court sentenced Collins to 120 months. The court also denied the government's motion under U.S.S.G. § 5K1.1 for a 25% departure from the low end of the sentence because the court thought that Collins had lied about the location of the stolen funds that were still missing.

## *I.*

On appeal Collins challenges only the application of § 2F1.1(b)(6), arguing first that "investment companies" are not "financial institutions" under the 1997 sentencing guidelines because Congress did not specifically include them in its definition of "financial institutions" when it passed the Crime Control Act of 1990, the authorizing statute for § 2F1.1(b)(6)(B). To support this argument, Collins relies entirely on our decision in *United States v. Tomasino*, 206 F.3d 739 (7th Cir. 2000), *modified by* 230 F.3d 1034 (7th Cir. 2000) (per curiam). In *Tomasino*, we evaluated whether the Sentencing Commission had misinterpreted the definition of "financial institutions" in the authorizing statute by expanding Congress's definition to include pension funds in the application note to § 2F1.1(b)(6). We opted to err on the side of underpunishment, explaining that the Commission might actually have relied on its legislative power to expand the definition, but that we could not say without additional explanation from the Commission. *Tomasino*, 206 F.3d at 742. Accordingly, we gave the Commission a "reasonable opportunity to clarify" whether it had acted in a legislative capacity in promulgating the expanded definition, *id.* at 743, but the Commission declined the invitation, *id*, 230 F.3d at 1035.

Collins believes that his case is analogous to *Tomasino* because "investment companies,"[2] although expressly defined as "financial institutions" in Application Note 14 to the 1997 version of § 2F1.1(b)(6), are not included in Congress's definition of "financial institutions" in the enabling statute. Accordingly, Collins argues that it is impossible to determine whether the Commission was exercising its legislative power in expanding the definition of financial institutions to include investment companies, and his sentence should therefore be vacated. However, in 2001 the Sentencing Commission effectively answered our earlier request for clarification by amending the guideline commentary to state explicitly that it intended to implement, "in a broader form," Congress's definition of "financial institutions." U.S.S.G. § 2B1.1, comment. (backg'd) (2002). *Tomasino* recognized that if the Commission were to add this language to the background commentary it would be "clear" evidence "that the Commission . . . was exercising its legislative power" in promulgating the broader definition of financial institutions. *Tomasino*, 206 F.3d at 741.

When the Sentencing Commission amended the background commentary to show that it was exercising its legislative power to expand the congressional definition of "financial institutions," it merely clarified its authority to enact the preexisting definition in Application Note 14 to § 2F1.1(b)(6), and so there is no issue in applying the

---

[2] Collins does not challenge the district court's characterization of Gateway as an "investment company." For a definition of "investment company," see *United States v. Savin*, 349 F.3d 27, 37 (2d Cir. 2003) (defining "investment company" in Application Note 14 to § 2F1.1(b)(6) of the guidelines as "a company substantially engaged in the business of investing in securities of other companies").

clarification retroactively. *See Tomasino*, 206 F.3d at 742-43 ("A clarifying guideline can lawfully be applied retroactively . . . . The background note does not prescribe punishment and the question of its meaning is unrelated to retroactivity."); *see also United States v. Hartz*, 296 F.3d 595, 598 (7th Cir. 2002) (court may apply clarifying amendments retroactively). Consequently, we may look to the Sentencing Commission's expanded definition of "financial institutions" in the 1997 guidelines—a definition that expressly includes "investment companies." *See* U.S.S.G. § 2F1.1, comment. (n.14) (1997).

Collins next argues that his fraudulent acts did not victimize Gateway within the meaning of § 2F1.1(b)(6) because Gateway was merely a sham used to facilitate a fraudulent scheme. The essence of Collins's argument is that a financial institution created solely for the purpose of defrauding investors cannot be considered a victim of a scheme to defraud. However, we came to the opposite conclusion in *United States v. Randy*, 81 F.3d 65 (7th Cir. 1996), the only case we have found that deals with the application of § 2F1.1(b)(6) to fraudulent corporations. Randy paid $30,000 for a "bank," which he named the Canadian Trade Bank, from the WFI Corporation, "a company apparently in the business of selling 'paper' banks which have no employees and no assets beyond the name and the banking license." *Randy*, 81 F.3d at 66-67. The "bank" was initially licensed by the government of Montserrat but soon lost the license when Montserrat tightened its banking regulations. *Id.* at 67. Randy then paid an additional $10,000 for the purchase of another entity in Grenada, which he again named the Canadian Trade Bank. *Id.* Because Grenada had no licensing laws, the Canadian Trade Bank "became a corporation which simply acted like a bank," until Grenada struck the company from the rolls of registered corporations in 1991. *Id.* Using the Canadian Trade Bank name, Randy

developed a nationwide network of "brokers" who were paid commissions to sell the "bank's" certificates. *Id.* From 1990 to 1992, the "brokers" sold more than $16 million worth of the certificates to more than 400 investors. *Id.* However, aside from some money paid to investors as "interest" in an attempt to prevent them from uncovering the scheme, Randy spent the majority of the money on private purchases and moved the rest into the accounts of friends. *Id.*

In challenging the application of § 2F1.1(b)(6) on appeal, Randy argued that "the Canadian Trade Bank was not the sort of financial institution the Sentencing Commission intended the guideline to cover." *Id.* at 69. We rejected this argument and held that Randy's "bank" fell within the guideline definition of "financial institution" and upheld the district court's sentence:

> The Canadian Trade Bank was licensed as a bank by Montserrat and licensed by Grenada as a company with broad banking powers. There is no reason to exclude it from the definition in the application note. Furthermore, when it walks and talks like a financial institution, *even if it's a phony one*, it is, in our view, covered by § 2F1.1(b)(6).

*Id.* (emphasis added). There appears to be no meaningful difference between the facts of *Randy* and the facts of the present case that would remove Gateway from the reach of § 2F1.1(b)(6). Like the Canadian Trade Bank, Gateway, a company incorporated in Illinois, was fraudulently held out to investors as a financial company that offered the opportunity to invest in high-return, zero-risk investments. Like the Canadian Trade Bank, Gateway utilized a network of "employees" to draw over 400 unwitting investors into the scheme, accumulating millions of dollars in receipts, all of which would eventually be siphoned out of the company by

the company's president and owner. Both companies therefore "walked and talked" like the financial institutions they purported to be.

Collins argues that his case is distinguishable from *Randy* because the Canadian Trade Bank was licensed whereas Gateway was only incorporated; the licensing of the Canadian Trade Bank was a factor that this court seemed to rely on in *Randy* in holding that the company "walked and talked" like a bank. Even if licensing is qualitatively different than incorporation for purposes of § 2F1.1(b)(6), a close reading of *Randy* reveals that the Canadian Trade Bank had no license when Randy began the scheme to defraud. Instead, the Canadian Trade Bank was simply a corporation, registered in Grenada, that represented itself as a bank that offered investment certificates. This corporate status is identical to the one held by Gateway during the course of Collins's scheme to defraud.

Our decision in *Randy* to apply § 2F1.1(b)(6) to fraudulent corporations is supported by the Sentencing Commission's expansive interpretation of what it means to substantially jeopardize the safety and soundness of a financial institution. The guidelines explain that an offense "shall be deemed to have 'substantially jeopardized the safety and soundness of a financial institution' if, as a consequence of the offense, the institution became insolvent; substantially reduced benefits to pensioners or insureds; was unable on demand to refund fully any deposit, payment, or investment; was so depleted of its assets as to be forced to merge with another institution in order to continue active operations; or was placed in substantial jeopardy of any of the above." U.S.S.G. § 2F1.1, comment. (n.15) (1997). Thus, the Commission interprets § 2F1.1(b)(6) broadly, to cover threats to the fiscal security of a corporation as well as the loss of individual investments. Because the Sentencing

Commission extends the protections of § 2F1.1(b)(6) beyond institutions to individual investors, it follows that the Commission would intend the guideline to apply to conduct that victimizes both legitimate and fraudulent corporations. In both cases investors lose their investments due to fraudulent conduct. It makes no difference to the individual investors in the present case whether Collins stole their money from a legitimate corporation or one created for fraudulent purposes; the important fact to the investors is that their investments will not be repaid.

Finally, Collins argues that even assuming fraudulent corporations may be considered "victims" under § 2F1.1(b)(6), the guideline should still not apply because he did not intend to cause harm to Gateway—the company was merely a conduit for the harm that he intended to inflict on individuals. This argument is meritless. The case that Collins cites as support, *Hartz*, 296 F.3d at 600, actually concludes that a fraudulent act need not be directly targeted at a financial institution in order for the guideline to apply so long as the institution is harmed as a collateral effect of the fraudulent conduct. Thus, even if Collins's scheme to defraud had only an indirect effect on Gateway, his use of Gateway to facilitate his scheme would fall within the scope of § 2F1.1(b)(6) under the logic of *Hartz*. But it is difficult to see how the insolvency of Gateway could be considered a collateral effect. Collins admitted in the plea agreement to having intended to steal every dollar sent by investors to the Gateway corporation, and, as a result of the scheme, few investors, if any, were able to recoup their investments.

Before concluding, we note that Collins has raised another argument in his reply brief. He argues, without citation to any legal authority, that the case should be remanded because the district court did not clarify which subsection, (A) or (B), of § 2F1.1(b)(6) it was using in sentencing him.

Subsection (A) requires the court to apply the adjustment if the defendant's fraudulent offense "substantially jeopardized the safety and soundness of a financial institution" while subsection (B) applies when the offense "affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense." But Collins does not explain how the court's alleged error prejudiced him, and in any case he has waived the argument by failing to raise it in his opening brief, *see Nelson v. La Crosse County Dist. Attorney*, 301 F.3d 820, 836 (7th Cir. 2002). Accordingly, this final argument is also meritless.

AFFIRMED.


A true Copy:

     Teste:


                       _____
                       *Clerk of the United States Court of*
                         *Appeals for the Seventh Circuit*