UNITED STATES of America,

v.

Polina SIROTINA; Mamed Mekhtiev; Albert Guglielmo; Philip Levenson, and Justin Fauci, Defendants.

No. 01–CR–1243 (CBA).

United States District Court, E.D. New York.

May 19, 2004.

Cynthia M. Monaco and Matthew L. Levine, Assistant United States Attorneys, Roslynn R. Mauskopf, United States Attorney, Eastern District of New York, Brooklyn, NY, for United States of America.

Ronald G. Russo, Esq., Herzfeld & Rubin, P.C., David Wikstrom, Esq. (of counsel), New York City, for Polina Sirotina.

Edward Palermo, Esq., Palermo & Palermo, P.C., Smithtown, NY, for Mamed Mektiev.

Louis R. Aidala, Esq., New York City, for Albert Guglielmo.

Jeremy Gutman, New York City, for Philip Levenson.

Victor J. Rocco, Esq., Heller Ehrman White & McAuliffe, New York City, for Justin Fauci.

### *AMENDED MEMORANDUM & ORDER*

AMON, District Judge.

### *INTRODUCTION*

The defendants Polina Sirotina, Mamed

Mekhtiev,[1] Albert Guglielmo, and Philip Levenson were convicted after trial of three charges: (1) conspiracy to commit mail and wire fraud, (2) mail fraud, and (3) money laundering. Justin Fauci entered a plea of guilty shortly before trial to the first two of these charges. The case arose from a scheme in which individuals were persuaded to invest millions of dollars in the spot currency trading market. All of the defendants worked at the trading firm Evergreen International Spot Trading, Inc. ("Evergreen"), which was also named as a defendant. A second corporate defendant, First Equity Enterprises, Inc. ("First Equity"), was a purported clearing house that took in the investors' money. First Equity ultimately sent over $37,000,000 of the invested money to Forex International Ltd. ("Forex") in Budapest, Hungary. Forex, which was controlled by the fugitive defendant Andre Koudachev, was supposed to be a trading partner with Evergreen. These international transfers of money from First Equity to Forex were the subject of the money laundering charge. As it turned out, no trades were conducted at Forex. Andre Koudachev and Sergei Harbarov instead stole the money.

Numerous issues have arisen concerning the proper application of the United States Sentencing Guidelines to the defendants. The majority of the guideline issues raised in this case were resolved in oral opinions on April 21, 2004 and May 17, 2004. I write separately to address the government's argument that this Court should impose a four-level increase pursuant to U.S.S.G. § 2F1.1(b)(8) for each defendant because the mail fraud offenses "substantially jeopardized the safety and soundness of a financial institution." Both the defen-

dants and the United States Probation Department take the position that the guideline is not applicable to the facts of this case since the subject corporations, Evergreen and First Equity, were not "financial institutions" within the meaning of this guideline.[2] For the following reasons, the Court agrees with the defendants and the probation department and declines to apply the upward adjustment.

## DISCUSSION

■ Section 2F1.1(b)(8) (2000) provides for a four-level enhancement "[i]f the offense (A) substantially jeopardized the safety and soundness of a financial institution; · or (B) affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense." Application Note 19 to § 2F1.1 defines "financial institution." It states, in relevant part:

"Financial institution," as used in this guideline, is defined to include any institution described in 18 U.S.C. §§ 20, 656, 657, 1005–1007, and 1014; any state or foreign bank, trust company, credit union, insurance company, investment company, mutual fund, savings (building and loan) association, union or employee pension fund; any health, medical or hospital insurance association; brokers and dealers registered, or required to be registered, with the Securities and Exchange Commission; futures commodity merchants and commodity pool operators registered, or required to be registered, with the Commodity Futures Trading Commission; and any similar entity, whether or not insured by the federal government.

---

1. Mamed Mekhtiev absconded after trial and remains a fugitive.

2. At oral argument on April 21, 2004, this Court ruled that the third entity, "Impact,"

although a financial institution for purposes of this guideline, was not jeopardized "as a consequence of the offense." *See* U.S.S.G. § 2F1.1, cmt. n. 20 (2000).

U.S.S.G. § 2F1.1, cmt. n. 19 (2000). Application Note 20 in turn explains the kind of impact on the institution's operation that would place it in substantial jeopardy:

> An offense shall be deemed to have "substantially jeopardized the safety and soundness of a financial institution" if, as a consequence of the offense, the institution became insolvent; substantially reduced benefits to pensioners or insureds; was unable on demand to refund fully any deposit, payment, or investment; was so depleted of its assets as to be forced to merge with another institution in order to continue active operations; or was placed in substantial jeopardy of any of the above.

*Id.* cmt. n. 20. The question for this Court is whether the Sentencing Commission intended for a "sham" institution—which is itself the vehicle through which the fraud is perpetrated—to be covered by this guideline. The government, relying on the expansive definition of "financial institution" in Application Note 19 and authority from the Seventh Circuit, claims that it did. The defendants maintain it did not. The defendants have the more compelling argument.

Initially, the Court notes that it was the government's position at trial that both Evergreen and First Equity were sham organizations purchased and/or created solely for the purposes of effecting what turned out to be an over $80,000,000 fraud. These companies were named as defendants and conspirators in the indictment, and characterized throughout the trial and in papers filed with the Court as "vehicles for fraud." The government's attempt to retreat from that characterization—by noting that Evergreen, prior to its purchase by the defendant Koudachev, was a legitimate corporation and that, at the beginning of its operation, there were some trades—does not alter the analysis. The government does not claim that Koudachev took over a healthy ongoing operation that

was destroyed, nor does it contend that the early trades represented the product of a legitimate business. As far as this Court understands it, all the money that flowed into Evergreen's coffers was obtained by fraudulent misrepresentations.

Nothing in the legislative history of the guideline, its interpretation by the Second Circuit, or its plain language justifies its application to institutions created and/or used to perpetrate a fraud. To the extent the Seventh Circuit has reached a contrary conclusion, *see United States v. Collins,* 361 F.3d 343, 347–48 (7th Cir.2004) (citing *United States v. Randy,* 81 F.3d 65 (7th Cir.1996)), this Court disagrees with its analysis.

 To properly interpret the guideline, it is important to understand its genesis. "In 1989, in the wake of the savings and loan crisis of the 1980s, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183." *United States v. Ferrarini,* 219 F.3d 145, 159 (2d Cir.2000); *see also UMLIC–Nine Corp. v. Lipan Springs Dev. Corp.,* 168 F.3d 1173, 1178 (10th Cir.1999). FIRREA was intended, in part, "to strengthen the enforcement powers of Federal regulators of depository institutions [and] ... to strengthen the civil sanctions and criminal penalties for defrauding or otherwise damaging depository institutions and their depositors." § 101(9)-(10), 103 Stat. at 187. In FIRREA, Congress directed the Sentencing Commission to promulgate guidelines "to provide for a substantial period of incarceration for a violation of, or a conspiracy to violate, section 215, 656, 657, 1005, 1006, 1007, 1014, 1341, 1343, or 1344 of title 18, United States Code, that substantially jeopardizes the safety and soundness of a federally insured financial institution." *Id.* § 961(m). In response to that mandate, the Commission drafted

what was in 2000 known as § 2F1.1(b)(8)(A). *See* U.S.S.G. § 2F1.1, cmt. n. 19 (2000) (quoted above). The Commission explained in the background note to this guideline that "[s]ubsection (b)(8)(A) implements, *in a broader form,* the instruction to the Commission in section 961(m) of Public Law 101–73." *Id.* cmt. backg'd (emphasis added). In *United States v. Ferrarini,* 219 F.3d 145, 160 (2d Cir.2000), the Second Circuit confirmed the authority of the Sentencing Commission, pursuant to its general statutory powers under 28 U.S.C. § 994(a), to expand the definition of "financial institution" beyond the specific FIRREA directive to protect federally insured financial institutions. It concluded that an uninsured premium financing corporation, which had been the victim of a fraud, came within the definition in Application Note 19. *Id.* at 160–62.

It is evident from the circumstances that drove Congress to direct the Sentencing Commission to draft § 2F1.1(b)(8) that the guideline was aimed at imposing additional punishment for conduct that results in the destruction of legitimate organizations, such as the savings and loan associations that were pilfered in the 1980s. In expanding the definition of "financial institutions," all the Sentencing Commission did was to include a broader array of legitimate entities subject to protection. There is no basis to conclude that the Commission chose to ignore the goal of the FIRREA directive and included sham organizations within the umbrella of covered institutions, thereby placing the victim and victimizer on equal footing. The Second Circuit decision in *Ferrarini* is wholly consistent with this analysis. The premium financing corporation in *Ferrarini* was a legitimate organization that had been defrauded by the defendants. *Id.*

The plain language of U.S.S.G. § 2F1.1(b)(8), the application notes, and its placement within the framework of § 2F1.1 all support this interpretation. *See United States v. Soileau,* 309 F.3d 877, 881 (5th Cir.2002) (finding, based on a reading of the history and text of the guideline, that Medicare is not a "financial institution"). The guideline provision cannot be divorced from its context. Section 2F1.1 is denominated "Fraud and Deceit." It sets the base offense level at 6 (§ 2F1.1(a)) and then lists a series of "special offense characteristics" that increase the offense levels. The principal enhancement is the loss to the victim (§ 2F1.1(b)(1)); the greater the loss, the more levels that are added. Other enhancements deal with such issues as the extent of planning that went into the fraud (§ 2F1.1(b)(2)) and the sophistication of the scheme (§ 2F1.1(b)(3)). Section 2F1.1(b)(8) is another special offense characteristic that calls for the addition of four levels if the fraud substantially jeopardizes a "financial institution." This provision imposes sanctions for the additional impact of the fraud on a legitimate organization and the added harm that results therefrom. When a legitimate institution is brought to its knees by fraud perpetrated on it, there is a ripple effect greater than the loss to the individual investors. To apply this guideline not to the victim but to the perpetrator makes no sense.

 In construing the Sentencing Guidelines, ordinary principles of statutory construction apply. *See United States v. Lewis,* 93 F.3d 1075, 1080 (2d Cir.1996) (citing *United States v. Kirvan,* 86 F.3d 309, 311 (2d Cir.1996)). Nothing in the definition of "financial institution" in Application Note 19 suggests that it was meant to apply to an organization whose *raison d'être* is to perpetrate fraud. *See* U.S.S.G. § 2F1.1, cmt. n. 19 (2000). When the Commission intends to apply a guideline to both legitimate and fraudulent activities, it knows how to do so. For example, in

U.S.S.G. § 3B1.3, the Commission drafted a guideline that imposes a two-level enhancement for someone who abuses a position of trust. In 1998, long after the definition of "financial institution" was added to the Guidelines, the application note to the abuse of trust provision was amended to clarify that the guideline applied both where a defendant actually holds a position of trust and where he or she pretends to do so. *Id.* § 3B1.3, cmt. n. 2 ("This adjustment also applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not."). No similar change was made to the application notes interpreting "financial institutions" in § 2F1.1(b)(8) to reflect its application to sham entities. Certainly, had the Sentencing Commission intended for the definition of "financial institution" to encompass a fraudulent one, it would have made plain such an unorthodox application of an ordinary term.

To the extent that the Seventh Circuit concluded otherwise in *United States v. Collins*, 361 F.3d 343, 347–48 (7th Cir. 2004), that decision is not binding on this Court and is not persuasive. There, the defendant Collins and his associates established a company, Gateway, and "promoted [it] as an investment company primarily involved in the international trading of bank instruments." *Id.* at 344. Collins made misleading promises to investors and defrauded them for his personal gain. *Id.* at 344–45. Relying on its earlier decision, *United States v. Randy*, 81 F.3d 65 (7th Cir.1996), the Seventh Circuit concluded that Gateway was a "financial institution" under § 2F1.1(b)(8): "Both companies ...

'walked and talked' like the financial institutions they purported to be."[3] *Collins*, 361 F.3d at 348 (quoting *Randy*, 81 F.3d at 69). In reaching this result, the Seventh Circuit did not rely on Application Note 19, which defines "financial institution," but rather rested its decision on Application Note 20, which addresses a different issue: namely, the nature of the impact on the institution necessary to constitute placing it in "substantial jeopardy." One of the several measures of impact on a corporation's soundness is its ability to meet its obligation to investors. *See* U.S.S.G. § 2F1.1, cmt. n. 20 (2000) ("An offense shall be deemed to have 'substantially jeopardized the safety and soundness of a financial institution' if, as a consequence of the offense, the institution ... was unable on demand to refund fully any deposit, payment, or investment ....."). The *Collins* court concluded from Application Note 20 that this guideline was meant "to cover threats to the fiscal security of a corporation as well as the loss of individual investments," and, therefore, it found the guideline applies to both legitimate and phony corporations. *Collins*, 361 F.3d at 348.

In this Court's view, the Seventh Circuit's analysis misconstrues the guideline. It is of course true that investors in both legitimate and illegitimate corporations suffer losses as a result of fraud. One can steal from a legitimate organization and cause losses to investors, or one can create a sham company and effect the same injury. The harm caused by the money lost, however, is covered by a different guideline provision, § 2F1.1(b)(1). (Here 17 levels were added as a result of the substantial investor losses. *See id.* § 2F1.1(b)(1)(R).) The threat to which

---

**3.** In *Ferrarini*, the Second Circuit quoted this phrase from *Randy*. *Ferrarini*, 219 F.3d at 162. However, this Court does not understand this citation to mean that the Second Circuit endorsed the view that a fraudulent

organization is a "financial institution" under U.S.S.G. § 2F1.1(b)(8). As noted, the issue here was not before the Second Circuit, and the subject corporation in that case was legitimate.

§ 2F1.1(b)(8) is directed is not the victim losses *per se* but to the separate harm caused by the destruction of a viable legitimate organization—a harm that is not necessarily congruent with investor losses. Application Note 19 addresses the damage to the entity itself, not the injury to the defrauded individuals. When viewed from the perspective of harm to the institution, the purpose of the guideline would not be served by punishing defendants for the destruction of a vehicle of fraud, which itself served no public good. In this case, the operation of Evergreen and First Equity was to no one's benefit, other than the defendants. Therefore, it is not appropriate to apply the guideline enhancement in the circumstances presented in this case.

## CONCLUSION

For the reasons set forth above, this Court declines to apply a four-level enhancement under U.S.S.G. § 2F1.1(b)(8) because, as sham entities, neither Evergreen nor First Equity qualify as "financial institutions" under the guideline.

SO ORDERED.