# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 04-2386
_____

United States of America,

Appellee,

v.

George L. Young,

Appellant.


_____

No. 04-2400
_____

United States of America,

Appellee,

v.

Kathleen I. McConnell,

Appellant.

*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*      Appeals from the United States
*      District Court for the
*      Western District of Missouri.
*
*      [PUBLISHED]
*
*
*
*
*
*
*

_____

Submitted: April 13, 2005
Filed: July 5, 2005

_____

Before MURPHY, HANSEN, and BENTON, Circuit Judges.

_____

HANSEN, Circuit Judge.

Pursuant to written plea agreements, George L. Young and Kathleen I. McConnell pleaded guilty to mail fraud, 18 U.S.C. § 1341 (2000), wire fraud, 18 U.S.C. § 1343 (2000), making false statements, 15 U.S.C. § 50 (2000), and criminal forfeiture, 18 U.S.C. § 982 (2000), related to a scheme to defraud investors in their cattle businesses. Young appeals the 108-month sentence imposed by the district court,[1] and McConnell appeals her 87-month sentence. We affirm.

I.

Young, a longtime cattle rancher, and McConnell, an accountant, were involved in various related business entities that were engaged in the cattle buying and management business throughout the 1980s and 1990s. Appellants engaged in fictitious transactions and represented to their clients and to banks that their businesses owned many more cattle than actually existed. Following a decline in the cattle market, the scheme eventually collapsed in 2001, causing Young and McConnell to close their businesses and file for bankruptcy protection. At the time, their businesses owned 17,000 head of cattle, although their records reported assets consisting of over 343,000 head of cattle. Their scheme cost individual investors approximately $147 million and cost banks approximately $36 million. Nearly $16 million was recovered from assets of the companies and distributed to the fraud victims.

_____

[1]The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

Following their indictment on fraud charges, the appellants cooperated extensively with the government agencies that were investigating the fraud. Both appellants entered into written plea agreements and pleaded guilty to each of the charges. At sentencing, the district court made the following adjustments to Young's base offense level of six: an eighteen-level increase based on the amount of the loss, U. S. Sentencing Guidelines Manual (USSG) § 2F1.1(b)(1)(S) (Nov. 2000); a two-level increase for more than minimal planning or a scheme to defraud more than one victim, USSG § 2F1.1(b)(2); a two-level increase for using sophisticated means, USSG § 2F1.1(b)(6)(C); a four-level increase for substantially jeopardizing the safety and soundness of a financial institution, USSG § 2F1.1(b)(8)(A); a two-level increase for an offense involving the violation of a prior administrative order, USSG § 2F1.1(b)(4)(C); and a three-level decrease for acceptance of responsibility, USSG § 3E1.1(b). The court then departed downward two levels for Young's extraordinary acceptance of responsibility, resulting in a sentencing range of 87-108 months, and sentenced Young to 108 months of imprisonment. The court applied the same adjustments to McConnell's base offense level except for the two-level increase for violation of a prior administrative order. After a two-level downward departure for extraordinary acceptance, McConnell faced a sentencing range of 70-87 months and received an 87-month sentence.

At sentencing, both defendants challenged the USSG § 2F1.1(b)(8)(A) four-level enhancement for jeopardizing a financial institution, and Young challenged the § 2F1.1(b)(4)(C) two-level enhancement for violation of a prior administrative order. The district court rejected both challenges. On appeal, the defendants again challenge the applicability of those same enhancements that they objected to at sentencing, and they argue that application of the enhancements violated the Sixth Amendment as construed in Blakely v. Washington, 124 S. Ct. 2531 (2004), and United States v. Booker, 125 S. Ct. 738 (2005).

## II.

A.      <u>Blakely/Booker</u> Challenge

Each of the appellants' written plea agreements contained an appeal waiver that provided: "The defendant agrees not to appeal or otherwise challenge the constitutionality or legality of the Sentencing Guidelines." (Plea at ¶ 12.) Appellants argue that the appeal waivers contained in their plea agreements do not foreclose their <u>Blakely</u> challenge because the waiver was not knowing, having been entered pre-<u>Blakely</u>, and because the plea agreements made an exception to the plea waivers for sentences above the statutory maximum. (Appellants' Br. at 29 n.4.) Their arguments are unavailing. "[T]he right to appellate relief under <u>Booker</u> [or <u>Blakely</u>] is among the rights waived by a valid appeal waiver, even if the parties did not anticipate the <u>Blakely/Booker</u> rulings." <u>United States v. Fogg</u>, No. 04-2723, 2005 WL 1186535, at *2 (8th Cir. May 20, 2005); <u>see</u> <u>also</u> <u>United States v. Reeves</u>, No. 04-2356, 2005 WL 1366432, at *3 (8th Cir. June 10, 2005) ("[A] voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise." (Modification in original) (internal marks omitted)); <u>United States v. Killgo</u>, 397 F.3d 628, 629 n. 2 (8th Cir. 2005) ("The fact that [the defendant] did not anticipate the <u>Blakely</u> or <u>Booker</u> rulings does not place the issue outside the scope of his waiver."); <u>United States v. Rutan</u>, 956 F.2d 827, 830 (8th Cir. 1992) ("[Defendant]'s assertion that he cannot waive an unknown right is baseless."), <u>overruled on other grounds by</u> <u>United States v. Andis</u>, 333 F.3d 886, 892 n.6 (8th Cir.) (en banc), <u>cert. denied</u>, 540 U.S. 997 (2003).

We have recognized that an appeal waiver does not preclude an appeal in certain limited circumstances, including the appeal of an illegal sentence. <u>See</u> <u>Andis</u>,

333 F.3d at 891-92 (noting that an illegal sentence is included within the miscarriage-of-justice exception to our otherwise strict enforcement of an unambiguous appeal waiver). "[A] sentence is illegal when it is not authorized by the judgment of conviction or when it is greater or less than the permissible statutory penalty for the crime." Id. at 892 (internal citation and marks omitted). Both of the appellants pleaded guilty to counts two and three of the indictment, each of which subjected them to a statutory sentence of not more than 30 years of imprisonment. See 18 U.S.C. §§ 1341, 1343. Young's 108-month sentence and McConnell's 87-month sentence are well below the applicable statutory maximum; indeed, they are not even one-third of the maximum. Although the argument that each Guidelines range defines a separate statutory maximum was a plausible argument following the Supreme Court's decision in Blakely, the Supreme Court ultimately remedied the Sixth Amendment concern with the Guidelines by making the Guidelines advisory rather than mandatory. See Booker, 125 S. Ct. at 764-66. Post-Booker, the Guidelines ranges are merely advisory ranges, and the criminal statute of conviction provides the maximum statutory sentence. As such, neither of the appellants' sentences was above the applicable statutory maximum of 30 years of imprisonment, and the miscarriage-of-justice exception for an illegal sentence does not apply. See Reeves, 2005 WL 1366432, at *3 (rejecting a miscarriage-of-justice claim where the sentence was within the range set by the statute of conviction).

During oral argument, counsel for appellants further argued that they were not challenging the constitutionality of the Guidelines as a whole, but rather the level of the burden of proof required to sustain the specific enhancements. This too is unavailing. Their argument that the enhancements had to be found by a jury beyond a reasonable doubt derives from the Sixth Amendment, a constitutional challenge that they both waived. As neither appellant otherwise challenges the validity of the plea agreement, we hold that their broad waivers of the right to appeal the constitutionality or legality of the Guidelines encompasses a Blakely/Booker challenge, and we need not reach the merits of the claim. See Fogg, 2005 WL 1186535, at *2.

Even assuming that the appellants did not waive this claim, we would review for plain error, and we find none. See United States v. Pirani, 406 F.3d 543, 550-52 (8th Cir. 2005) (en banc) (describing the four-part plain error test of United States v. Olano, 507 U.S. 725, 731 (1993)). The district court departed downward two levels for each defendant based on their extraordinary acceptance of responsibility, but then sentenced each appellant at the top of their respective range. In doing so, the district court stated that "the harshness of the sentence from where I sit and perhaps from where the defendants sit is due because of the heinous nature of the offense" (Sent. Tr. at 215), comparing sentences for white collar crimes to the generally harsher sentences imposed for bank robberies and concluding that "this is just punishment" (Id.). Neither appellant can "demonstrate a reasonable probability that the court would have imposed a lesser sentence" had it known that the Guidelines were merely advisory at the time of the sentencing hearing. Pirani, 406 F.3d at 553.

B. USSG § 2F1.1(b)(8)(A) enhancement for substantially jeopardizing the safety and soundness of a financial institution.

Both defendants preserved the right to appeal the application of those Guidelines enhancements that they contested at sentencing. The district court increased both defendants' sentences by four levels for substantially jeopardizing the safety and soundness of a financial institution. See USSG § 2F1.1(b)(8)(A). The Guideline application notes explain that "[a]n offense shall be deemed to have ‹substantially jeopardized the safety and soundness of a financial institution' if, as a consequence of the offense, the institution became insolvent; . . . was so depleted of its assets as to be forced to merge with another institution in order to continue active operations; or was placed in substantial jeopardy of any of the above." USSG § 2F1.1, comment. (n.20). We focus on whether the appellants' actions placed any bank "in substantial jeopardy of" becoming insolvent or being forced to merge with another bank. We review the district court's application of the Guidelines de novo, but its

underlying factual findings for clear error. See United States v. Mathijssen, 406 F.3d 496, 498 (8th Cir. 2005).

The appellants' cattle-buying customers borrowed large sums of money from various banks to fund their cattle investments. The government introduced evidence at the sentencing hearing concerning three Nebraska banks: the Elkhorn Valley Bank & Trust (Elkhorn Valley), the Bank of Madison, and the First National Bank of Beemer, each of which suffered large losses when their bank customers were unable to repay the loans taken out to fund investments in the appellants' cattle. The Federal Deposit Insurance Corporation (FDIC) examined each of the banks as part of its regulatory examination process. Each of the banks had received high composite ratings of 1 or 2 prior to the discovery of the appellants' fraud.[2] Following the discovery of the fraud and the resulting loan losses, the FDIC rated Elkhorn Valley a composite rating of 4 and categorized its capital position as "critically undercapitalized," the lowest capitalization category available under the FDIC's rating system. With its capital ratio under two percent, the FDIC required Elkhorn Valley to raise an additional $4 million of capital within 90 days, without which Elkhorn Valley would have been placed into receivership by the FDIC and sold. Elkhorn Valley was unable to obtain capital from its regular sources and ultimately raised the $4 million from family members and senior bank officers, who cashed in IRAs and mortgaged their homes. Elkhorn Valley's president testified that without the additional capital, the bank would have been sold. Even after the additional $4

---

[2]The FDIC rates banks on a scale of 1 to 5, with 1 indicating that a bank has strong performance and is of little supervisory concern; 2 indicating that a bank is fundamentally sound and provides no material supervisory concerns; 3 indicating some supervisory concern but failure is unlikely; 4 indicating concerns regarding unsafe or unsound practices such that failure is a distinct possibility if weaknesses are not addressed and resolved; and 5 indicating extreme unsafe or unsound practices such that failure is highly probable. (Appellants' Br. at 9-10.)

million in capital, Elkhorn Valley remained "significantly undercapitalized," the second-lowest capital rating.

The FDIC considered the Bank of Madison to be "significantly undercapitalized" following the discovery of the fraud and the resulting loan losses, and it gave the Bank of Madison a composite rating of 4 until it could raise an additional $2.5 million in capital. The FDIC rated the First National Bank of Beemer a composite 3 rating, requiring a $2.5 million capital infusion to return it to an adequate capitalization position from a "significantly undercapitalized" position. The FDIC examiners noted that part of each bank's loan losses stemmed from the high concentration of loans to a particular group of cattle buyers, but otherwise characterized each bank's management team as strong.

The appellants raise several issues concerning the application of this enhancement to their sentences. First, they argue that USSG § 2F1.1(b)(8)(A) should apply only where the financial institution is a direct victim of the offense conduct. The plain language of the Guideline is not so limiting, and the Guideline applies "[i]f the offense substantially jeopardized the safety and soundness of a financial institution." USSG § 2F1.1(b)(8)(A). "[A] fraudulent act need not be directly targeted at a financial institution in order for the guideline to apply so long as the institution is harmed as a collateral effect of the fraudulent conduct." United States v. Collins, 361 F.3d 343, 349 (7th Cir. 2004) (construing the 1997 version of the enhancement, then located at USSG § 2F1.1(b)(6) (1997)). We decline to adopt the appellants' argument that this enhancement applies only when the financial institution is a direct victim of the fraud.

We also reject any assertion that it was not foreseeable to the appellants that their fraudulent actions would jeopardize the safety and soundness of banks with which they were not directly involved. The Eggerling group of investors, who obtained at least part of its funding from Elkhorn Valley, lost over $30 million from

the appellants' scheme. Given this level of investing, it was reasonably foreseeable to the appellants that their investors would be borrowing money from banks and using the cattle purportedly bought from the appellants as collateral for the loans. In fact, the investors' banks, including Elkhorn Valley, performed inspections of the appellants' operations and cattle in an effort to ensure the security of the collateral backing the loans made to the appellants' investors. The appellants well knew that the consequences of their fraud extended well beyond their own banks and their individual investors.

The appellants also argue that the banks' over-concentration of credit to a single group of customers contributed to the extent of the losses, such that the banks' losses were not "a consequence" of their fraudulent activity. The FDIC examiners testified that while concentration of credit was a concern that required special attention by the FDIC and by a bank's management team, in and of itself a concentration of credit in a single source of repayment is not bad. It was only when it was discovered that the collateral and the source of repayment for the concentration of credit–the cattle–never existed due to the fraudulent actions of the appellants that the banks actually suffered the significant losses and capital depletion. We agree that the language relied upon by the appellants requires some kind of causal connection between the offense and the substantial jeopardy to a bank's safety and soundness. See USSG § 2F1.1, comment. (n.20) ("An offense shall be deemed to have ‹substantially jeopardized the safety and soundness of a financial institution' if, as a consequence of the offense, the institution . . . was placed in substantial jeopardy of any of the above." (emphasis added)). Nothing in that language requires that the offense be the sole cause of the jeopardy to the bank's safety and soundness. Clearly, the jeopardy in which the banks were placed was a direct consequence of the appellants' fraud.

The fighting issue concerning this enhancement is whether the safety and soundness of any of the banks was "substantially jeopardized." The appellants argue

that none of the banks was ever rated lower than a composite 4 by the FDIC, and that all of the banks were able to timely raise sufficient capital to restore their capital bases to adequate levels. Notwithstanding, we agree with the district court that the significant losses and resulting precarious position, especially of Elkhorn Valley, satisfy the purpose of the enhancement. After accounting for the loan losses caused by the fraud, Elkhorn Valley's capital base was eroded to a position of being "critically undercapitalized," with a capital ratio of less than two percent. Only through Elkhorn Valley's president's extraordinary efforts was it able to raise the $4 million within the time necessary to avoid being placed into receivership by the FDIC. Even after the $4 million capital infusion, Elkhorn Valley remained "significantly undercapitalized," with a capital ratio of just 2.9 percent. (Sent. Tr. at 14.) The district court found, and we see no clear error in its finding, that "but for the conduct of the defendants, these banks, particularly Elkhorn [Valley] Bank, would not have been placed in such serious jeopardy." (Sent. Tr. at 196.) The district court appropriately applied the enhancement. See United States v. Brierton, 165 F.3d 1133, 1136 (7th Cir. 1999) (affirming application of the enhancement where the district court found that "had it not been for . . . [the defendant] resigning and the installation of a new president, the credit union faced a real danger of closing or going into receivership") (internal marks omitted, alteration in original).

C.    USSG § 2F1.1(b)(4)(C) enhancement of Mr. Young's sentence for violating a prior administrative order.

The district court imposed a two-level enhancement to Young's offense level because his offense involved "a violation of a[] prior, specific . . . administrative order . . . not addressed elsewhere in the guidelines," USSG § 2F1.1(b)(4)(C), specifically the prior United States Department of Agriculture (USDA) administrative orders related to previous Packers and Stockyards Act violations. Young argues on appeal that the imposition of the enhancement constituted impermissible double-counting because his sentence included a guilty plea to Count Four of the indictment,

-10-

charging him with making false entries in accounts and records required to be maintained under the Packers and Stockyards Act. The USDA had issued three orders to Young in 1979 and 1986, requiring him to keep accounts, records, and memoranda that fully disclosed all transactions involved in his business as a market agency or dealer subject to the Packers and Stockyards Act.

"Double counting occurs when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been . . . accounted for by application of another part of the Guidelines." United States v. Fortney, 357 F.3d 818, 821-22 (8th Cir. 2004) (internal marks omitted, alteration in original). In computing Young's offense level in the presentence report, the probation officer grouped the multiple counts of conviction pursuant to USSG § 3D1.2(d), which requires grouping where the offense level is determined primarily on the basis of the total amount of the loss. Young started with a base offense level of six, USSG § 2F1.1(a), to which an eighteen-level enhancement was added based on the amount of the loss, USSG § 2F1.1(b)(1)(S). The other enhancements (more than minimal planning, use of sophisticated means, and jeopardizing a financial institution) were not related to the Packers and Stockyards Act record-keeping violation. Even though Young's sentence included his conviction for violating the Packers and Stockyards Act, the amount of the loss inflicted, rather than the Packers and Stockyards Act records violation, determined Young's adjusted offense level. The effect of the grouping meant there was no "counting" of the Packers and Stockyards Act violation in calculating Young's ultimate sentence, and that violation was not determinative of any part of the eventual 108-month sentence. Thus, the USSG § 2F1.1(b)(4)(C) enhancement for violating a prior USDA administrative order did not result in impermissible double-counting because it did not increase his "punishment on account of a kind of harm that ha[d] already been . . . accounted for by application of another part of the Guidelines." Fortney, 357 F.3d at 821-22 (holding that there was no impermissible double counting where, as a result of the grouping rules, an enhancement for endangering human life by manufacturing methamphetamine was

not otherwise accounted for in calculating the defendant's offense level) (internal marks omitted, second alteration in original).

In addition, we agree with the government that violation of a prior administrative order represents a different harm than a current violation. "A defendant who does not comply with such a prior, official judicial or administrative warning demonstrates aggravated criminal intent and deserves additional punishment." USSG § 2F1.1, comment. (n.6) (explaining application of § 2F1.1(b)(4)(C)). See also United States v. Maloney, 406 F.3d 149, 153-54 (2d Cir. 2005) (holding that application of § 2F1.1(b)(4)(C) for violating a prior child support order was not impermissible double-counting on a conviction for willful failure to pay child support, where the offense level for the underlying conviction was based on the amount of harm to the child support recipient under USSG § 2B1.1 and did not itself account for the separate harm inflicted upon the state's adjudicative processes). Thus, the fact that Young was convicted for a current violation of the Packers and Stockyards Act does not take into account his aggravated conduct of simultaneously disregarding three prior administrative orders concerning similar conduct. Application of the enhancement required by § 2F1.1(b)(4)(C) merely recognizes Young's recidivism–his willingness to repeatedly disregard prior administrative orders–as a basis for increasing his sentence.

## III.

The district court's judgments are affirmed.

_____