# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 03-3832

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DAWON D. PUCKETT,

*Defendant-Appellant.*

_____

Appeals from the United States District Court for
the Northern District of Illinois, Western Division.
No. 02-CR-50072—**Philip G. Reinhard**, *Judge.*

_____

ARGUED MAY 26, 2004—DECIDED APRIL 22, 2005

_____

Before BAUER, POSNER and COFFEY, *Circuit Judges.*

COFFEY, *Circuit Judge.* On July 18, 2002, Dawon Puckett
was convicted before a jury of armed bank robbery, 18 U.S.C.
§ 2113(a) & (d), using a firearm during a violent crime,
18 U.S.C. § 924(c)(1)(A), and possession of 63 grams of co-
caine with intent to distribute, 21 U.S.C. § 841(a)(1). He
was sentenced to a period of confinement of 384 months to
be followed by six years' supervised release and ordered to
pay restitution in the amount of $27,674. On appeal, Puckett
argues that his convictions should be reversed, alleging that
the trial court erred in: 1) admitting evidence of his prior

conviction for drug trafficking and thereby unfairly pre-
judicing the jury against him; and 2) refusing to instruct the
jury on the lesser-included offense of simple possession. We
affirm.

## I.  Background

On October 8, 2002, a branch office of the National City
Bank in Rockford, Illinois, ("Bank") was robbed at gunpoint
by a man described as wearing a striped "Jamaican-style"
hat, fake dreadlocks, beard and moustache, and dark
glasses. The armed robber, whose image was captured on
the Bank's surveillance cameras, entered the Bank at about
2 p.m., threatened the Bank's employees and various
customers with his weapon, and ordered the tellers to fill
the two pillowcases he handed them with money. He also
warned the tellers that if they included any "dye packs"
with the stacks of currency, he would return and kill them.
The armed robber then exited the Bank with some $27,000
as proceeds of the robbery, entered a dark-colored, late model
Ford Expedition sports utility vehicle ("SUV"), and drove
away in the direction of Levings Lake Park, a public rec-
reation area located not far from the Bank.

Detectives from the Rockford Police Department and FBI
agents were called to the scene and proceeded to investigate
the crime scene and interview bank personnel as well as
members of the public and the tellers whom the robber had
threatened during the heist. The suspect was described as a
black male in his mid 20's, approximately six-foot tall and
weighing about 150 pounds. The witnesses also described
the robber's disguise—his "Jamaican-style" hat, fake dread-
locks, moustache and beard, and dark glasses—and further-
more informed the detectives that the robber had duct tape
wrapped around his fingertips. The tellers informed in-
vestigators that the offender had fled in a dark colored Ford
Expedition in the direction of Levings Lake Park, and in

addition supplied the officers with a partial license plate number on the vehicle. Based on this information, the Rockford Police Department issued an all points bulletin for the SUV and its driver. A Rockford patrol officer heard the bulletin and pursued the vehicle to Levings Lake Park, where he located the vehicle parked near a picnic area, unoccupied, and after investigating, determined the vehicle to have been the stolen Ford Expedition and seized it.

Having the vehicle in custody believed to have been used in the robbery, but unable to locate the robbery suspect, the Rockford Police Department issued a press release containing a general description of the wanted suspect and sought the community's help in capturing him. The press release contained few specific details of the robbery and how it was carried out and it did not make any mention of the robber's disguise, the fact that he used duct tape on his fingertips, or that he had threatened the Bank's tellers.

On October 11, 2002, three days after the robbery, the Rockford police received information from one Antwon Flint, who identified the robbery suspect as Dawon Puckett. Flint told the police that he had been playing cards with Puckett on the evening of October 8, 2002 (the date of the robbery), and that Puckett had related to him that he had committed the armed robbery, supplying Flint with some of the details concerning the crime that were previously unknown to the public, *e.g.*, that he had worn fake dreadlocks, had used a Ford SUV as the getaway vehicle, and that he had parked the vehicle nearby at Levings Lake Park. Flint also relayed to the police that Puckett had displayed a large amount of cash, "at least $27,000," and informed them that Puckett was currently living in the basement of his grandmother's house, at 1916 Knowlton Street in Rockford, a location one to two minutes walking distance from where the stolen getaway vehicle was found abandoned in the Levings Lake Park area. In addition, the police received information from one Juan Soto, the owner of the Ford Expedition, that a

SUV matching the description of the one used in the robbery had been taken by his girlfriend, without his permission, earlier in the day. Soto also told investigators that he had seen an individual matching Puckett's description driving the vehicle, without his consent, in the parking lot of a Kmart located adjacent to the National City Bank just hours before the Bank was robbed.[1]

Pursuant to this information, the Rockford police obtained a photograph of Puckett from their files and arranged an array with the photos of five other individuals similar in appearance, weight, age, height and complexion. The detectives then took this photo array to the Bank, displayed it to two of the tellers present during the robbery, and both tellers identified Puckett as the armed individual who had committed the robbery on the date in question, October 8, 2002. Based on this information, the Rockford Police Department and the FBI placed Puckett's grandmother's house (1916 Knowlton Street) under surveillance. Shortly thereafter, the officers observed Puckett exit the house and enter a vehicle owned and operated by a female (Debra Harris). Rockford police stopped the car after a short distance and arrested Puckett on suspicion of bank robbery. Puckett was handcuffed and searched, and $1,294.76 in cash was discovered in the pocket of his trousers. After receiving permission from Harris, the vehicle's owner and driver, officers proceeded to search the interior of the car and discovered and confiscated a plastic baggie containing what appeared to be a large stash of powder cocaine, in the glove compartment. When questioned about the narcotics, Puckett admitted that the drugs belonged to him, and stated that he

---

[1] On a tip from his friends, Soto went to the parking lot of the Kmart adjacent to the National City Bank to see if he could locate his Ford Expedition. While there he spotted the vehicle and was nearly ran over by the driver, a person who resembled Puckett's description.

knew the cocaine weighed two-and-a-quarter ounces (63 grams) because he had recently "measured it exactly."

Puckett was subsequently taken to the Public Safety Building in Rockford, Illinois, advised of his Miranda rights, and interviewed by Rockford police detectives. When questioned concerning his whereabouts on the day of the bank robbery, Puckett claimed he was getting a haircut at the time of the bank robbery, although he later changed this story when he was unable to provide the name of the barbershop he had supposedly visited for the haircut. Instead, Puckett explained that he had obtained the haircut two days later, during a "shopping spree" on Michigan Avenue in Chicago, a trip he claimed was funded by a workman's compensation insurance settlement. During this interview Puckett again admitted that the 63 grams of cocaine found in the glovebox of Harris's vehicle at the time of his arrest belonged to him, but then refused to cooperate and provide any information concerning the armed robbery. However, Puckett did state that he would "consider" cooperating if detectives were to tell him what kind of sentence he was facing. The detectives, in response, informed the suspect that neither the details of a potential sentence nor a "deal" would be discussed until he fully disclosed his involvement in the bank robbery. Puckett refused and, with the questioning at an impasse, Puckett was taken to a holding cell to await his subsequent transfer to the Ogle County Jail for processing and a decision on formal charges against him relating to the armed robbery.

Shortly after, Puckett was moved to the county jail and he was assigned to share a cell with Kenneth Johnson, an associate of Puckett's from the Rockford area. During a series of conversations, Puckett subsequently divulged various details of the robbery to Johnson including information and facts about the crime that had not been disclosed to the general public. Specifically, Puckett told Johnson that he had duct-taped his fingertips before the robbery to avoid

leaving fingerprints as well as recounting the fact that he warned the bank tellers not to put dye packs in the pillow-cases or he would return and kill them. Puckett also stated that he "just did what he had to do" because he was broke, and requested Johnson's help to contact his brother and instruct him to move the proceeds of the robbery from the place he had hidden it (the cold-air duct in the basement of his grandmother's house) to a different (undisclosed) location. Johnson later relayed all of this information to the police in exchange for a lighter sentence on drug charges that he was facing. Acting on Johnson's information, the Rockford officers searched the basement of Puckett's grandmother's house, with her consent. The officers did not find the cash proceeds of the robbery in the air duct, although they did discover several bags of new clothes and shoes in the area of the basement where Puckett had been staying, and also located a loaded .22 caliber handgun between the mattress and the boxsprings of Puckett's bed.[2]

Nevertheless, based on the evidence that the Rockford police and the FBI gathered and later submitted to a grand jury, Puckett was indicted on one count of armed bank robbery, 18 U.S.C. § 2113(a) & (d), one count of using a firearm during a violent crime, 18 U.S.C. § 924(c)(1)(A), and one count of possession of 63 grams of cocaine with intent to distribute, 21 U.S.C. § 841(a)(1). Puckett pleaded not guilty to all three charges and requested a trial by jury.

In preparing for the trial, Puckett's counsel made a motion to the court requesting that he be allowed to ask the prospective jury members at voir dire whether they or their family members had problems with cocaine addiction. Based on this request, the government anticipated that Puckett might attempt to defend against the drug distribution charge and claim that he possessed the cocaine for personal use

---

[2]   Indeed, the missing proceeds of the robbery were never located.

only, and thus the prosecution, prior to trial, asked leave of the court to introduce Puckett's three prior Illinois state court convictions for drug trafficking in evidence. Puckett objected to the admission of evidence concerning his convictions, arguing that his three previous convictions for possession of crack cocaine with intent to deliver, one dating from 1993 and two others from 1996, were too remote in time and dissimilar to his current drug charges to show anything other than his propensity to commit the charged offense. Puckett also argued that the convictions' limited probative value was outweighed by the danger of unfair prejudice. After reviewing the briefs submitted and hearing arguments on the issue, the trial judge ordered that the government, pursuant to the Federal Rules of Evidence, would only be allowed to submit evidence of Puckett's most recent, 1996, drug trafficking conviction in Winnebago County, Illinois. The court reasoned that his most recent prior drug conviction was relevant to proving Puckett's knowledge and intent to commit the charged offense of possession of cocaine with intent to distribute, and that the contemporaneous nature and similarity between the facts of that crime and the allegations in the instant case made the evidence sufficiently probative. The court further determined that any prejudice that might result from the admission of Puckett's prior conviction was outweighed by its probative value, and advised the parties that a limiting instruction would be given to the jury in order to cure any possible undue prejudice.

Accordingly, during Puckett's trial, the government introduced evidence of his 1996 Winnebago County conviction for possession of crack cocaine with intent to distribute. In addition, the government elicited testimony from Sheriff's Deputy Dennis Hill, the officer who arrested Puckett in connection with the 1996 drug charge. Hill testified that, after arresting and transporting Puckett to the police station following a traffic violation, he discovered two plastic baggies

that Puckett had left behind containing 51 "rocks" of cocaine while searching under the back seat of the police vehicle he used to convey Puckett to the station.[3] Hill explained that Puckett was subsequently charged and convicted in Winnebago County, Illinois, in 1996 of possession of crack cocaine with intent to deliver. Following Hill's testimony, the judge instructed the jury that it should consider the evidence of Puckett's 1996 drug trafficking conviction submitted only for the limited purpose of intent or knowledge of the drugs as it related to the charge at issue. The same instruction was again read to the jury immediately prior to the time they retired to render a decision.[4]

The government also presented evidence at trial to demonstrate Puckett's guilt on the possession of 63 grams of cocaine with intent to distribute charge in the instant case in the form of an expert witness, Sergeant Steven Johnson of the Rockford, Illinois Police Department. Sgt. Johnson testified that, based on his experience combating drug trafficking in the Rockford, Illinois area,[5] the amount of powder cocaine possessed by Puckett, 63 grams, was known on the street as "two-and-a-lick," and had a street value of between $1200 and $1500. Such quantities of powder cocaine, Johnson explained, are normally acquired by street-level dealers who in turn add substances to dilute the cocaine while still in powdered form in order to increase the drug's

---

[3] Hill stated that he had inspected his vehicle prior to placing Puckett in the police vehicle and had not found any contraband.

[4] The limiting instruction was taken directly from the Seventh Circuit's Pattern Jury Instructions. *See* Federal Criminal Jury Instructions of the Seventh Circuit 3.04 (1999).

[5] Sgt. Johnson was qualified at trial as an expert witness in the field of narcotics investigations. Johnson stated that he is a supervisor with the Rockford Police Department's Metro Narcotics Unit, and during his twenty-six years on the force had participated in and/or supervised approximately 2,000 narcotics investigations.

volume for distribution. Thereafter the cocaine-base mixture is converted into crack cocaine and divided into packages containing approximately two-tenths of a gram which, at that time, would generally sell for approximately $20 on the street. Johnson stated further that if the powdered form of the drug was not converted into a crack cocaine product, a street-level dealer would generally dilute and divide the large quantity of powdered cocaine that Puckett possessed into smaller quantities for resale to street users. Packages of powdered cocaine weighing between one-tenth of a gram and a "whole" gram would then be sold for $10 to $70. Sgt. Johnson, who had some nine years of experience investigating narcotic offenses, posited that he had never had any experience with a cocaine user possessing more than three-and-a-half grams of the powder form of the drug for personal consumption, and that, based upon his training, knowledge and experience, the 63 grams possessed by Puckett would most accurately be referred to as a "distribution amount."

While defending against the possession with intent to distribute charge, Puckett failed to present any evidence or to take the witness stand in support of his claim that the 63 grams of cocaine was solely for personal use. Instead, Puckett relied solely on the testimony that his attorney had elicited upon cross-examination of the Rockford police officers who discovered the cocaine and later performed a consent search of Puckett's grandmother's house.[6]

At the close of the evidence, Puckett requested that the court instruct the jury on the lesser-included offense of sim-

---

[6] During that testimony the officers stated that they found .7 grams of marijuana (user quantity) and some $1,300 in cash on Puckett following his arrest, but admitted that they did not discover any paraphernalia indicative of drug trafficking either in the defendant's possession when he was arrested nor during a subsequent search of his grandmother's residence.

ple possession of drugs as an alternative to the possession with intent to deliver cocaine charge. The judge refused to submit the defendant's requested instruction to the jury after reviewing the evidence presented, concluding that Puckett had failed to submit any evidence "that he possessed [the cocaine] other than for sale." The jury returned guilty verdicts on each of the three crimes charged: armed bank robbery, in violation of 18 U.S.C. § 2113(a) & (d), using a firearm during a violent crime, in violation of 18 U.S.C. § 924(c)(1)(A), as well as possession of 63 grams of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

## II. Analysis

On appeal, Puckett does not challenge any aspect of his convictions for armed bank robbery or using a firearm during a violent crime. Puckett argues only that he is entitled to a new trial because the district court committed a reversible error pertaining to his conviction under 21 U.S.C. § 841(a)(1) for possession with intent to distribute 63 grams of cocaine. Specifically, Puckett argues that the trial court erred in: 1) admitting evidence of his previous conviction for drug trafficking; and 2) refusing to instruct the jury on the lesser-included offense of simple possession of cocaine.

### A. Admission of Puckett's Previous Conviction

We review the judge's decision to admit evidence under Rule 404(b) of the Federal Rules of Evidence for an abuse of discretion. *United States v. Jones*, 389 F.3d 753, 756 (7th Cir. 2004). The trial judge allowed the government to introduce evidence of Puckett's prior 1996 conviction for drug trafficking for the limited purpose of demonstrating Puckett's knowledge and intent as it related to the drug charge. In accordance with Rule 404(b), evidence of a prior conviction is "not admissible to show that a defendant has

a propensity to commit crime and that he acted in conformity with that propensity on the occasion in question." *United States v. Best*, 250 F.3d 1084, 1090 (7th Cir. 2001). Such evidence may be admissible, however, to demonstrate "motive, opportunity, intent, preparation, plan, knowledge or identity." *Id.* The admissibility of prior convictions under Rule 404(b) is judged according to a four-part test which requires the government to demonstrate that:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*Jones*, 389 F.3d at 757. After considering the evidence and the law applicable thereto, we conclude that the introduction of evidence concerning the defendant's prior conviction is in compliance with the requirements of the four-part test referred to above.

Puckett argues that the evidence of his prior conviction demonstrated nothing but his propensity to engage in criminal conduct. We disagree. It is well settled in this circuit that, "when a defendant is charged with a specific intent crime, such as possession with intent to distribute . . . evidence of past action is probative if used to establish an essential element of the crime charged." *United States v. Macedo*, 371 F.3d 957, 967 (7th Cir. 2004), *accord United States v. Long*, 86 F.3d 81, 84 (7th Cir. 1996). The crime of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), is a specific intent crime making the defendant's state of mind an element of the crime which is to be determined by the finder of fact. *Long*, 86 F.3d at 84.

Puckett's defense to the drug charge was premised on his claim that he lacked the requisite intent to distribute the drugs due to the fact that the cocaine was for personal use only; thus the government was entitled to introduce evidence of prior drug trafficking convictions in order to prove this element of the crime, Puckett's intent. *Id.* at 84-85. Indeed, evidence of a prior conviction for possession of narcotics with intent to distribute is especially relevant and probative when, as here, Puckett conceded that he was in possession of an unusually large amount of cocaine, but denied that the drugs were intended for anything other than personal consumption. *Jones*, 389 F.3d at 757-58. Puckett's prior (1996) drug trafficking conviction was relevant and probative as to his intent to distribute the drugs and was not introduced to establish, as Puckett argued, his criminal character or "to show [his] action in conformity therewith." Fed. R. Evid. 404(b).[7]

Puckett also argues that his 1996 conviction for possession with intent to distribute crack cocaine was too remote in time and dissimilar to the drug charge in this case to be considered as probative of his intent to distribute the large amount of cocaine he possessed at the time of his arrest. This argument is equally without merit. The conviction, entered in 1996, was close enough in time to the facts of this case—the arrest in this case took place in October of 2002 and Puckett was indicted on November 5, 2002—to constitute probative evidence of his intent. We have previously held that convictions entered as long as thirteen years prior to subsequent prosecutions which the government

---

[7] Puckett did not argue that the trial judge was in err when he determined that his (Puckett's) prior conviction was relevant to demonstrating his knowledge of the drug trade. We note that the conviction was relevant to demonstrating that Puckett "was familiar with the cocaine business." *United States v. Kreiser*, 15 F.3d 635, 640 (7th Cir. 1994).

has sought to introduce are admissible, in spite of the length of time between the crimes. *See United States v. Tringali*, 71 F.3d 1375, 1379 (7th Cir. 1995) (nine years); *United States v. Wimberly*, 60 F.3d 281, 285 (7th Cir. 1995) (thirteen years). Puckett's prior drug trafficking conviction occurred only six years prior to the charged crimes in this case (2002), a fact which weighs in favor of admissibility. *See Wimberly*, 60 F.3d at 285.

Further support for the prior conviction's admissibility can be found in the similarity of the nature of the criminal conduct underlying Puckett's 1996 conviction and that of the acts charged here. It is true that Puckett's 1996 conviction involved possession with intent to deliver crack cocaine and the crime in the instant case involves powder cocaine. However, this is a *distinction without substance*. Both crimes involve the possession with intent to distribute a chemical composition of cocaine.[8] Differences in the form of the drug involved in a prior crime or even type or category of narcotics is irrelevant to the admissibility of that evidence when "both incidents concerned distribution amounts of drugs." *See United States v. Hernandez*, 84 F.3d 931, 935 (7th Cir. 1996). Puckett's 1996 conviction and the crime charged here each involved possession of large, distribution-level amounts

---

[8] For purposes of our analysis in this case, there is no need to draw a distinction between powdered cocaine, and its chemically manipulated counterpart, crack cocaine. This especially true given the fact that street-level dealers often purchase powder cocaine, in the amounts on the order of that possessed by Puckett, in order that they may later reformulate the narcotic into crack cocaine. *See United States v. Edwards*, 397 F.3d 570, 573-74 (7th Cir. 2005) (explaining that crack cocaine is chemically very similar to powdered cocaine and that a simple chemical process can be performed to convert one into the other); *United States v. Robinson*, 110 F.3d 1320, 1325 (8th Cir. 1997); *United States v. Teague*, 93 F.3d 81, 84 (2d Cir. 1996); *United States v. Wint*, 974 F.2d 961, 967 (8th Cir. 1992).

of narcotics. In 1996 Puckett was arrested while in possession of 51 "rocks" of crack cocaine, and when arrested in 2002 he admitted to possessing 63 grams of powdered cocaine. Both of these amounts are far greater than what could be considered a "small amount" of cocaine and therefore Puckett's contention that the form and amount of the drug seized in both instances creates a dissimilarity in the crimes is without merit. *United States v. Walsh*, 231 F.3d 366, 369 (7th Cir. 2000) (holding that 5.4 grams of crack cocaine could be considered a distribution amount) (citing *Hernandez*, 84 F.3d at 935); *United States v. Tanner*, 941 F.2d 574, 587 (7th Cir. 1991) (55.5 grams of cocaine, in conjunction with other evidence, sufficient for a jury to infer that defendant possessed cocaine with intent to distribute).

In addition, both crimes involved the discovery of large amounts of cocaine in Puckett's possession. Puckett unpersuasively attempts to distinguish his 1996 conviction from the offense charged in this case by pointing to the fact that when arrested in 1996, the crack cocaine he possessed was discovered underneath the back seat of a squad car after he was placed there following his arrest on an unrelated charge, whereas the narcotics in this case (which he admitted ownership of) were found in the glove box of a vehicle in which Puckett was a passenger. However, "simple differences" in the conduct "at issue cannot defeat the similarity requirement . . . . '[t]he prior acts need not be duplicates of the one for which the defendant is now being tried.'" *Long*, 86 F.3d at 84 (quoting *United States v. Lloyd*, 71 F.3d 1256, 1264-65 (7th Cir. 1995)). The mere fact that Puckett did not attempt to conceal the drugs in this case in the same manner as he did in 1996, bears no relation whatsoever to the relevant issue in this case—whether he intended to distribute this large amount of narcotics that he freely admitted to

owning.[9] *See Long*, 86 F.3d at 84 ("when evidence is offered to prove intent, the degree of similarity is relevant only insofar as the acts are sufficiently alike to support an inference of criminal intent"). Accordingly, Puckett's 1996 Winnebago County conviction was close enough in time and factually similar enough to the charge in this case to be relevant evidence of his intent to possess *and distribute* 63 grams of cocaine.

Puckett also argues that the "marginal" probative value of his previous conviction was far outweighed by its prejudicial effect. In determining whether the admission of evidence of prior bad acts unfairly prejudiced a defendant, we begin with the understanding that " 'our decisions have emphasized that most relevant evidence is, by its very nature, prejudicial, and that evidence must be *unfairly* prejudicial to be excluded.' " *Long*, 86 F.3d at 86 (quoting *United States v. Curry*, 79 F.3d 1489, 1496 (7th Cir. 1996)) (emphasis in original). Evidence of this nature is only considered to be unfairly prejudicial if it "induce[s] the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *Id*. As discussed above, the evidence of Puckett's prior conviction for possession and intent to distribute a large amount of crack cocaine was highly relevant and probative as to his intent to possess and distribute cocaine. For this is a matter which constituted an element of the crime and which Puckett made an issue in this case when he himself "concede[d] that he possessed the drugs but denie[d] that he planned to distribute them." *Jones*, 389 F.3d at 757-58. Thus, there is no doubt that the fact that he had been convicted in 1996 of a strikingly

---

[9] It would be highly illogical for us to conclude that simply because Puckett was able to successfully conceal the cocaine long enough in 1996 for him to plant it under the back seat of a police cruiser, but was caught red-handed here, his prior conviction is inadmissible.

similar crime (possession with intent to distribute a large amount of crack cocaine) somewhat prejudiced Puckett's case, but the only legal question is whether Puckett was *unfairly* prejudiced. *Best*, 250 F.3d at 1093.

Puckett contends that the evidence of his prior conviction *unfairly* prejudiced his case by influencing the jury's verdict against him on the other charged crimes; armed bank robbery and use of a firearm during a violent crime. Puckett states that, although the jury had no trouble reaching a unanimous verdict on the possession with intent to distribute charge, it reported to the trial judge that it was deadlocked on the remaining two charges, an impasse that it subsequently resolved after the judge ordered further deliberations. The implication being that the jury relied on the prior conviction for drug trafficking to paint him as a criminal who would also carry out a bank robbery. However, Puckett's argument is based on nothing but pure, self-serving speculation, and finds no support in the record. Juries frequently encounter an impasse in their deliberations for reasons that are a mystery to all but the jurors on the panel, and aside from his own self-serving intimation and conjecture Puckett proffers no logical basis or factual evidence that would support a conclusion that the jury ended its impasse and returned guilty verdicts on all counts, based upon its consideration of evidence of his prior conviction for drug trafficking. *See id.* The court specifically instructed the jury during the trial in accordance with the approved Seventh Circuit jury pattern instruction on two separate occasions: once during trial shortly after the evidence of Puckett's prior conviction was offered, that "[you] should consider this evidence only as it relates to this case for the purpose of intent or knowledge. *It may not be considered as evidence of anything else*, and [may only be considered] for *the purpose of knowledge or intent* as related to a charge here against the defendant"; and then again before the jury began deliberating, that "[y]ou have heard evidence of acts of the defendant other

than those charged in the indictment. *You may consider this evidence only on the question of the defendant's knowledge and intent as to Count 3 [the drug charge]. You should only consider this evidence for these limited purposes.*" We are convinced that this limiting instruction given to a jury (especially when taken nearly verbatim from the Seventh Circuit Pattern Jury Instructions) is most "effective in reducing or eliminating any possible unfair prejudice from the introduction of [evidence of prior bad acts]."[10] *Id.* We presume "that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instruction given them." *United States v. Linwood*, 142 F.3d 418, 426 (7th Cir. 1998) (quoting *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985)). And this presumption can "only [be] overcome if there is an 'overwhelming probability' that the jury was unable to follow the instruction as given." *Id.* (quoting *Doe v. Johnson*, 52 F.3d 1448, 1458 (7th Cir. 1995)). Based on this record "we are confident that the jury diligently assumed their duty and obligation under the law and followed the court's instructions" to consider the evidence of Puckett's prior conviction for the limited purposes of his knowledge and intent as it related to the drug charge, *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1049 (7th Cir. 2003). Puckett has failed to demonstrate that the jury disregarded the judge's instructions, or that the admission of the evidence of his

---

[10] At oral argument, Puckett's counsel contended that the limiting instructions given by the trial judge were confusing and added to, rather than dispelled the prejudicial effect of admitting evidence of his prior conviction. Puckett did not develop this argument in his briefs however, so it is waived. *United States v. Collins*, 361 F.3d 343 (7th Cir. 2004). Moreover, we also note that Puckett failed to object to this jury instruction at trial.

prior conviction "induce[d] the jury to decide the case on an improper basis . . . rather than on the evidence presented."[11] *Long*, 86 F.3d at 86. Accordingly, he has failed to demonstrate that the admission of the evidence was *unfairly* prejudicial.

Because evidence of Puckett's prior conviction for possession and distribution of crack cocaine was probative, relevant and not unfairly prejudicial pursuant to Rule 404(b), we conclude that the district court did not abuse its discretion in admitting the evidence of his prior conviction.

## B. Refusal to Instruct on the Lesser-Included Offense

Puckett argues that the trial judge erred when he refused to instruct the jury on the lesser included offense of simple possession. Puckett requested that the court give the jury an alternate instruction stating that: "If you find the defendant not guilty of the crime of possession of 63 grams of cocaine with intent to distribute charged in the indictment (or if you cannot unanimously agree that the defendant is guilty of that crime), then you must proceed to determine whether the defendant is guilty or not guilty of the lesser offense of simple possession of 63 grams of cocaine." *See* Federal Criminal Jury Instructions of the Seventh Circuit 7.02 (1999). "To be entitled to an instruction regarding a lesser-included offense, a defendant must establish that (1) the offense on which he seeks an instruction is a lesser-included offense of the one charged, and (2) a rational jury could find him guilty of the lesser offense but not guilty of

---

[11] The government presented a wealth of evidence to demonstrate Puckett's guilt on both the armed robbery and use of a firearm during a violent crime charges. *See supra* at pp. 3-6.

the greater offense." *United States v. McCullough*, 348 F.3d 620, 624 (7th Cir. 2003). "We review the first prong of that test *de novo* and the second prong for an abuse of discretion." *Id.*

As the government concedes, and our case law makes clear, "simple possession is indeed a lesser included offense of possession with intent to distribute." *United States v. Hill*, 196 F.3d 806, 808 (7th Cir. 1999). However, that fact alone does not mean that Puckett was "entitled to a lesser-included-offense instruction 'as a matter of course'." *United States v. Hernandez*, 330 F.3d 964, 972 (7th Cir. 2003) (quoting *United States v. Wright*, 131 F.3d 1111, 1112 (4th Cir. 1997)). Instead, in order to satisfy the second prong of the inquiry into whether he was entitled to an instruction on the lesser-included offense of simple possession, Puckett needed to produce sufficient evidence at trial so that "a jury could rationally find him [guilty] of the lesser offense yet acquit him of the greater." *Schmuck v. United States*, 489 U.S. 705, 716 n.8 (1989).

Puckett offers only his self-serving assertion that the drugs were intended for personal use only. Indeed, Puckett failed to present any direct evidence whatsoever at trial that he was a cocaine user or possessed the drug because he had any intention of consuming it himself, and also failed to offer any explanation as to how such a large amount of cocaine (63 grams) could rationally be considered consistent with personal use.[12] Instead, Puckett's defense to the govern

---

[12] At oral argument, Puckett's counsel claimed that the defendant was a "producer" in the music business, and that because some individuals in this line of business are notorious for their prodigious drug use, a rational jury could have concluded that Puckett did possess the drugs for personal use. Counsel argued that Puckett possessed such a large amount because he had bought in "bulk quantity" in order to "get a better deal." However, Puckett did not

(continued...)

ment's charge that he possessed the drugs solely for distri-
bution was based upon negative inferences only. He argues
that because no trappings of the drug trade—such as cut-
ting agents, beepers, cell phones, or scales—were found on
his person at the time of his arrest or during a later search
of his grandmother's residence, and because the officers who
arrested him also found him in possession of a "user quantity"
of marijuana (.7 grams), the jury could have rationally
inferred that he possessed the drugs solely for personal use.
These circumstantial details of his arrest fall far short of
constituting convincing evidence supporting Puckett's claim
of simple possession, and fail to create a question for the
jury on the issue of whether he possessed such a large
quantity of drugs strictly for personal use. The absence of
any drug dealer's paraphernalia is inconclusive of personal
use. *See Wright*, 131 F.3d at 1113. It may be that Puckett
had a separate venue which he used to process the cocaine
for distribution or that he was a mid-level drug runner,
either scenario is irrelevant for each would constitute pos-
session with intent to deliver. Furthermore, we attach no
significance to Puckett's self-serving assertion that the rela-
tively small amount of marijuana he possessed demonstrated
that he was a user rather than a dealer of that drug, when
the narcotic at issue here is cocaine, and not marijuana.
Even if Puckett was a recreational marijuana user, that fact
alone falls far short of establishing that he was not also a big
time cocaine dealer. It would be antithetical to conclude
that simply because an individual uses drugs, they are not
also involved in the drug trade in a distribution capacity as
well.

---

[12] (...continued)
present this argument to the district court, nor did he even refer
to it in his opening brief. Accordingly, it is waived. *See Hottenroth
v. Village of Slinger*, 388 F.3d 1015, 1033 (7th Cir. 2004); *Collins*,
361 F.3d 343.

Conversely, the government introduced overwhelming evidence establishing that the quantity of drugs Puckett possessed could only be intended for distribution. The government's evidence included testimony from its expert witness Sgt. Johnson and evidence of the defendant's prior conviction for possession of 51 "rocks" of crack cocaine with intent to deliver, to establish conclusively that Puckett intended to distribute the cocaine for profit rather than retain it for personal use. The amount of cocaine Puckett admitted to possessing, 63 grams, is in excess of what one would possess for personal use, and is in and of itself sufficient evidence to compel an inference that he intended to distribute the drug. *See United States v. Breland*, 356 F.3d 787, 792 (7th Cir. 2004) ("intent to distribute can be inferred from the possession of a quantity of drugs larger than needed for personal use") (quoting *United States v. Maholias*, 985 F.2d 869, 879 (7th Cir. 1993)); *United States v. Turner*, 93 F.3d 276, 288 (7th Cir. 1996) (same); *Wright*, 131 F.3d at 1113; *but cf. Hill*, 196 F.3d at 807. Puckett's near-certain status as a dealer rather than a user was further confirmed by the expert testimony of Sgt. Johnson, a twenty-six-year veteran of the police force, who described the precise quantity of powdered cocaine Puckett possessed—"two-and-a-lick" in street vernacular—as a "distribution amount" commonly purchased by street-level dealers to reformulate into crack or resell in powder form in much smaller quantities. Sgt. Johnson further stated that, based upon his knowledge and experience with narcotic interdiction in the Rockford area, he had never come across any cocaine user who possessed more than three-and-a-half grams of cocaine for personal use—Puckett was in possession of 18 times this much cocaine at the time of his arrest, *i.e.*, for even a severely addicted user it would take approximately 18 days to exhaust a 63 gram supply. In addition, the government also introduced the evidence of Puckett's conviction for drug trafficking just six years earlier when he was found with another, similar large stash of cocaine, which, as discussed

above, was highly probative (and admissible) evidence of his intent to distribute the cocaine he possessed.

Because there is no evidence in the record to support Puckett's theory that the 63 grams of cocaine found in his possession in 2002 were for personal use, *see Hernandez*, 330 F.3d at 972, the district court also did not abuse its discretion in refusing to instruct the jury on the lesser-included offense.

### III.  Conclusion

The decision of the district court is

AFFIRMED.

A true Copy:

       Teste:

                         _____

                      *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*